RICHARD A. GOREN & others[1] vs. ROYAL INVESTMENTS
INCORPORATED & others.[2]

No. 86-498.

Suffolk. October 20, 1987. — December 9, 1987.

Present: DREBEN, KASS, & FINE, JJ.

*Practice, Civil,* Findings by judge. *Contract,* What constitutes. *Real Property,* Purchase and sale agreement.

A preliminary agreement bearing the caption "Offer to Purchase" which concluded a course of active negotiations between the buyer and seller of a parcel of real estate, resolving all significant economic issues, including the sale price, certain sequential deposits, the handling of current leases and the making of new ones, a closing date, and payment of a broker's commission, but which, by its terms, contemplated the execution of a more formal agreement, could properly be found to contain all the material terms of the parties' contract in a form sufficiently definite to be enforceable, with execution of the later agreement being hardly more than a formality. [139-143]

CIVIL ACTION commenced in the Superior Court Department on July 18, 1984.

The case was heard by *David H. Kopelman,* J., sitting under statutory authority.

*Anthony E. Battelle (Robert M. Ruzzo* with him) for Paramount Associates.

*Regina L. Quinlan* for Royal Investments Incorporated.

*Robert B. Carpenter (Joseph S. Ayoub, Jr.,* with him) for Richard A. Goren & others.

---

[1] James Piatt and Thomas Piatt. With Goren, the Piatts formed a general partnership called Opera Development Associates.

[2] F.D. Rich Co., Inc., and Joseph J. Berlandi, who are partners with Royal Investments Incorporated in a partnership known as Paramount Associates.

KASS, J.  Once again we consider in what circumstances a writing, which by context or by terms contemplates a more formal agreement, may nonetheless serve as a binding contract.

We summarize the facts which present the problem. After a course of negotiations during May, 1984, Piatt Associates and Richard A. Goren (collectively called "Opera") as buyer, and Royal Investments Incorporated ("Royal"), as seller, signed a document as of June 6, 1984, contemplating the sale by Royal to Opera of the premises at 565-567 Washington Street, Boston (the "locus"). That document bore the caption "Offer to Purchase." Over the signature of Opera were the words "SUBMITTED BY" and over the signature of Royal there appeared the words "ACCEPTED BY." Prior to the signed document of June 6, 1984, there had been four drafts which successively offered improved terms to the seller but which were not acceptable to it.

The fifth, and accepted, draft, i.e., that of June 6, 1984, offered a price of $762,000, entirely in cash. There were provisions which provided for: sequential deposits (aggregating $50,000); the handling of then current leases and the making of new ones; a closing date; and payment of a broker's commission by the seller. Under a caption which read, "PURCHASE AND SALE," there appeared the following sentence: "A mutually acceptable Purchase and Sale Agreement shall be executed within four weeks of acceptance of this offer."

Before a purchase and sale agreement was signed, Royal received an offer to buy its property that was $78,000 higher than that which Opera had made. Royal became inattentive to calls from Opera or the broker. Although it had expected Royal, as seller, to proffer a purchase and sale agreement, Opera had an agreement prepared (on the 1978 edition of the Greater Boston Real Estate Board form), which incorporated the terms of the June 6th document. Opera then tendered signed copies of that agreement to Royal. On July 11, 1984, twenty-four hours after it had signed an agreement to sell to the party that had offered the better price, Royal informed Opera that their deal was off. "[W]e cannot sign this agreement," Royal explained, "in that we cannot guarantee the removal of the

Moto-Photo tenant from the building." Two days earlier on July 9th, Royal had, for a price, in fact secured the agreement of Moto-Photo to vacate its space in the locus.

Among his detailed findings the trial judge found as follows: The document dated June 6, 1984, and countersigned by the seller on June 7, 1984, had been the end product of active negotiations. It constituted more than a preliminary expression of intent or draft for discussion purposes. Rather, the parties intended to be bound as of June 7, 1984, by the provisions of the June 6th document, and execution of a purchase and sale agreement was no more than a formality intended to tidy up ministerial and nonessential terms of the bargain. The transaction was not particularly complex and did not require intricate final documents. Assertions by Melone, Royal's principal officer, that he would not have agreed to boilerplate provisions in the agreement tendered by Opera (relating, e.g., to state of the title, insurance, liquidated damages in the event of buyer's default) were not credible because the same provisions appeared in the agreement Royal signed to get the higher price.

The provision in the June 6th document looking to execution of a purchase and sale agreement, the judge concluded, contemplated that the parties would exercise good faith in attempting to draft and negotiate such an agreement. Royal, the judge found, did not act in good faith. In its refusal to execute the agreement tendered by Opera, it "was motivated entirely by the increased financial benefits which Royal would realize if it were able to convey the property to Paramount Associates at a purchase price of $840,000 . . . ." Judgment entered requiring Royal to convey the locus to Opera for $762,000, the price in the June 6th document.

We are, of course, bound by the judge's findings of facts unless they are clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *First Pennsylvania Mortgage Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621-622 (1985). *Connecticut Jr. Republic* v. *Doherty*, 20 Mass. App. Ct. 107, 110 (1985). On appeal Royal prudently does not dissipate its energy in rebutting the implicit finding of the judge that it suffered a spell of moral abandon. Rather, relying on *Rosenfield* v. *United*

*States Trust Co.*, 290 Mass. 210 (1935), and its progeny,[3] Royal urges that the judge was clearly in error in finding that the parties had agreed on all significant points. The clause contemplating execution of a purchase and sale agreement, Royal contends, was a talisman of the inchoate quality of the June 6th document.

To be sure, as the court observed in the *Rosenfield* case, language looking to execution of a final written agreement justifies a strong inference that significant items on the agenda of the transaction are still open and, hence, that the parties do not intend to be bound. *Id.* at 216. See also *Doten* v. *Chase*, 237 Mass. 218, 220 (1921); *Chapin* v. *Ruby*, 321 Mass. 512, 515 (1947); *Currier* v. *Kosinski*, 24 Mass. App. Ct. 106, 108 (1987). Cf. *Capezzuto* v. *John Hancock ·Mut. Life Ins. Co.*, 394 Mass. 399, 403 (1985). If, however, the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract. *Ibid.* Although the parties exchanged slogans of agreement in the *Rosenfield* case such as, "that is all settled" and "the deal was closed," it was apparent that the negotiations were imperfect on points which were material and, indeed, weighty in the context of the transaction. *Id.* at 216-217. *Rosenfield* concerned a jewelry store lease. The parties had not reached agreement on the design and specifications of a store front; the cost of that work and whether the landlord would bear all of it or part of it was unresolved; the parties were dickering over whether the landlord would pay all of the heat or whether the tenant would pay for heat if gross sales (and, consequently rent) did not attain certain minima; and the parties were still debating who would pay for water. *Id.* at 217. In the circumstances, the court saw the parties' preliminary written

---

[3] *Saxon Theatre Corp.* v. *Sage*, 347 Mass. 662, 666-667 (1964). *Mann* v. *Wolff*, 352 Mass. 776 (1967). *Blair* v. *Cifrino*, 355 Mass. 706, 709-710 (1969). *Lucey* v. *Hero Intl. Corp.*, 361 Mass. 569, 574-575 (1972). *Mendel Kern, Inc.* v. *Workshop, Inc.*, 400 Mass. 277, 279 (1987). *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 630 (1979). *JRY Corp.* v. *LeRoux*, 18 Mass. App. Ct. 153, 169-172 (1984).

memorandum of several business points agreed upon as an agreement to reach an agreement, which imposed no obligation on them. *Id.* at 217.

Here, by contrast, all significant economic issues were resolved in the preliminary agreement. The additional matters with which the form purchase and sale agreement treated were subjects such as state of the title, conformance with local law, condition of the premises, extension provision to allow seller time to remove title defects, buyer's right of election to accept a deficient title, performance to be merged in delivery of the deed, use of purchase money to clear title, maintenance of insurance at not less than eighty percent of sound insurable value, assignment of insurance, closing adjustments, holding of deposit by broker, and disclaimer of implied warranties. These points are not without importance and may, on occasion, be the subjects of bargaining. They are, however, subsidiary matters and norms exist for their customary resolution. The form of agreement tendered by Opera conformed to those norms, and the seller does not suggest that at the time of the preliminary agreement there were differences of position on any of the subsidiary points. Compare *Blomendale* v. *Imbrescia, post* 144 (1987).

Royal argues that the highly material matter of delivering the premises free of the tenancy of In and Out Photo of New England, Inc. (known as Moto-Photo), was not resolved. It may not have been resolved between Royal and Moto-Photo (the latter, after the preliminary agreement, appears to have jacked up the price of being bought out), but it was surely resolved in the preliminary agreement, which provided: "Current leases must be terminated by the seller and premises now occupied by Moto-Photo will be delivered vacant at or prior to the closing date."

On the basis of the judge's findings, for which there is support in the record, that the preliminary agreement covered all material points and that the parties so regarded it, the case falls into that category where execution of a more formal instrument "was hardly more than a formality." *Coan* v. *Holbrook,*

327 Mass. 221, 224 (1951).[4] The *Coan* case has both antecedents and progeny. See *Nigro* v. *Conti,* 319 Mass. 480, 482-483 (1946); *Sands* v. *Arruda,* 359 Mass. 591, 596 (1971); *Bridge Enterprises, Inc.* v. *Futurity Thread Co.,* 2 Mass. App. Ct. 243, 248 (1974); *David J. Tierney, Jr., Inc.* v. *Wellington Carpets, Inc.,* 8 Mass. App. Ct. 237, 241 (1979); *Roddy & McNulty Ins. Agency, Inc.* v. *A.A. Proctor & Co.,* 16 Mass. App. Ct. 525, 531-532 (1983); *Cataldo* v. *Zuckerman,* 20 Mass. App. Ct. 731, 737 (1985); *Rand-Whitney Packaging Corp.* v. *Robertson Group, Inc.,* 651 F.Supp. 520, 535-537 (D. Mass. 1986). See Restatement (Second) of Contracts § 27 (1979).

This is not to say that parties to a preliminary agreement may not provide that they do not intend to be bound until the transaction is buttoned up by a more detailed and formal agreement. There is commercial utility to allowing persons to hug before they marry. See *Tull* v. *Mister Donut Dev. Corp.,* 7 Mass. App. Ct. 626, 631-632 (1979).[5] If "[p]arties to what would otherwise be a bargain and a contract . . . agree that their legal relations are not to be affected [,] [i]n the absence of any invalidating cause, such a term is respected by the law like any other term . . . ." Restatement (Second) of Contracts § 21 comment b (1979). A proviso of that sort should speak

---

[4]In *Coan* the preliminary writing provided that the seller would "sign your usual purchase and sale agreement." The words "your usual" are more suggestive of a routine formality than the words "mutually acceptable" which modified "purchase and sale agreement" in the case before us. It is a distinction worth noting but it is not, in our view, dispositive in this case. Forms which contemplate execution of a purchase and sale agreement in a particular form, e.g., the standard purchase and sale agreement published by the local real estate board, are even more suggestive of a routine formality because a promise to execute a particular form comes close to incorporation of a text by reference.

[5]Royal introduced evidence from a real estate broker that it was the custom of the real estate business in Boston to look to a full-blown purchase and sale agreement before regarding parties as bound. The judge was not required to be persuaded and, in any event, custom would not override intent in a particular case, or settled law. See, however, as to the norm, *Currier* v. *Kosinski,* 24 Mass. App. Ct. 106, 108 (1987).

plainly, e.g., "The purpose of this document is to memorialize certain business points. The parties mutually acknowledge that their agreement is qualified and that they, therefore, contemplate the drafting and execution of a more detailed agreement. They intend to be bound only by the execution of such an agreement and not by this preliminary document."

So much of the judgment as declared relief is affirmed. Paragraph 3 of the judgment is modified to provide that Royal Investments Incorporated, its agents, employees or attorneys, as owner and seller, shall in or within thirty days of the issuance of the rescript from the Appeals Court deliver to the plaintiffs or their nominee, good and marketable title by quitclaim deed to the premises at 565-567 Washington Street, Boston, in exchange for payment of $762,000 in cash, certified check, cashier's check, or any combination of the three. The balance of the judgment is affirmed.

*So ordered.*