NORMAN A. LEVENSON *vs.* L.M.I. REALTY CORPORATION.

No. 89-P-471.

Suffolk. November 15, 1990. - July 26, 1991.

Present: ARMSTRONG, BROWN, & JACOBS, JJ.

*Contract*, What constitutes, Sale of real estate. *Real Property*, Sale.

Negotiations between the owner of an apartment building and a prospective buyer culminating in a letter signed by the owner promising that, on receipt of an offer containing certain specified conditions and terms, "we will enter into a purchase and sale agreement forthwith satisfactory to both parties," did not constitute a contract where the parties, both experienced in real estate transactions, used terminology indicating that they did not regard the letter to be itself an offer that created in the prospective buyer a power by acceptance to create a contract. [129-131]

CIVIL ACTION commenced in the Superior Court Department on November 16, 1981.

The case was heard by *John C. Cratsley*, J.

*Robert E. McLaughlin* (*Donna E. Cohen* with him) for the plaintiff.

*Karen M. Thursby* for the defendant.

ARMSTRONG, J. The plaintiff (Levenson) seeks specific performance of an alleged contract to purchase real estate, consisting of an apartment building on Queensbury Street in Boston. The question, which is close on the facts, is whether the negotiations between Levenson and the defendant culminated·in a contract.

The principal of the defendant is Louis M. Insoft. Both he and Levenson have substantial real estate holdings and are thoroughly experienced in the purchase and sale of real estate. Insoft engaged one Stein, a real estate broker, to find a buyer for the Queensbury Street building. After producing an offer that Insoft rejected, Stein interested Levenson in the

property. Levenson gave Stein a verbal offer that Insoft rejected, then a written offer that Insoft also rejected. Over the course of a year Insoft raised his asking price several times until it reached $400,000. Levenson doubted that the rents justified the price. In the fall of 1981 the defendant was allowed rent increases, and Stein attempted to persuade Levenson to make a new offer. Levenson, exasperated by Insoft's record of rejections, told Stein he would not make any further offers unless Insoft reduced to writing the terms upon which he would sell.

Stein, learning Insoft's terms from the latter's accountant, prepared a typewritten letter for Insoft's signature, which read as follows:

"October 7, 1981

Dear Mr. Stein;

      The following are the terms and conditions under which I will sell my property at 25-29 Queensbury St. Boston, to Mr. Norman Levenson.

    1. Price - $ 400,000 net to me
    2. 1st Mortgage - $ 175,000 ( to be placed by the buyer)
    3. 2nd Mortgage - $ 225,000 ( to be taken back by the seller)
    4. Terms of the 2nd Mortgage. - 5 year note bearing interest only at 12% for the first year and 15% for the balance of the term.

    I personally guarantee that if this offer is made to me within the next 14 days, we will enter into a purchase and sale agreement forthwith.

                       Very truly yours

                       Louis M. Insoft
                       LMI Realty"

Stein gave the letter to the accountant, who altered the text by writing in, after the words "we will enter into a purchase and sale agreement forthwith," the words "satisfactory to both parties." (The judge found that the accountant added

these words because Insoft did not wish to be bound by any purchase and sale agreement until he had the opportunity to speak to Mr. Gerber, his attorney, who was then on vacation.) Insoft then signed the letter in his capacity as president of L.M.I. Realty Corp.

On October 19, 1981, within the two-week period specified by Insoft's letter, Levenson returned to Insoft (through Stein, who prepared the document) an offer to purchase conforming in every respect to the terms set out in the Insoft letter. The offer was typed on the standard offer form of the Greater Boston Real Estate Board (1978 revision). The only terms specified in addition to those recited by the Insoft letter were a provision that the offer should remain open until 5:00 P.M. on November 6, 1981, and that the parties should execute by November 15, 1981, the Greater Boston Real Estate Board standard purchase and sale agreement "or any form substantially similar thereto, which, when executed, shall be the agreement."

The Greater Boston Real Estate Board standard offer form has a line for the seller to subscribe his acceptance of the offer before its expiry date. Compare the forms in *Goren* v. *Royal Invs., Inc.*, 25 Mass. App. Ct. 137, 138 (1987), and *Blomendale* v. *Imbrescia*, 25 Mass. App. Ct. 144, 145 (1987). Insoft declined to sign his acceptance, saying he wanted Mr. Gerber to review it first. Mr. Gerber, after a delay, proposed new terms altogether, and any agreement quickly fell apart.

On these facts the judge was justified in concluding that the negotiations stopped short of a contract. Insoft's guarantee was less than an unqualified promise to sell the Queensbury Street property. Contrast *Coan* v. *Holbrook*, 327 Mass. 221, 221-222 (1951). Rather, it was a promise that, on receipt of an offer containing specific terms, "we will enter into a purchase and sale agreement forthwith satisfactory to both parties." Contrast, again, *Coan* v. *Holbrook, supra* at 222 ("[we] will, on acceptance, sign your usual purchase and sale agreement . . ."). Contrast also *Goren* v. *Royal Invs., Inc., supra*, where the buyer's detailed offer was "accepted"

in writing by the seller in circumstances that caused the court to conclude that a contract had been reached despite the contemplation of a later purchase and sale agreement.

The norm in real estate transactions has been that, where the parties sign a writing contemplating the later execution of a purchase and sale agreement, they do not intend to be bound until that time. *Doten* v. *Chase*, 237 Mass. 218, 220 (1921). *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935). *Goren* v. *Royal Invs., Inc.*, 25 Mass. App. Ct. at 142 n.5, citing *Currier* v. *Kosinski*, 24 Mass. App. Ct. 106, 108 (1987). But the norm, or rule, is not monolithic. The contemplation of a later writing has been stated as "justif[ying] a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled." *Rosenfield* v. *United States Trust Co.*, *supra* at 216. The controlling fact, however, is always the intention of the parties, *Goren* v. *Royal Invs., Inc.*, *supra*, and that will normally present a question of fact for the judge.

Here the judge could properly give weight to the fact that Insoft's letter called for the submission of an "offer," and the offer submitted by Levenson in response contemplated an acceptance by Insoft. That is to say, the parties, both experienced in real estate transactions, used terminology indicating that they did not regard Insoft's letter to be itself an offer that created in Levenson a power by acceptance to bind the contract. See 1 Corbin, Contracts § 11, at 24, 25 (1950)("[A]n offer creates a power of acceptance in the offeree. . . . It must be an act that leads the offeree reasonably to believe that a power to create a contract is conferred upon him"). Restatement (Second) of Contracts § 24 (1979)("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited *and will conclude it* [emphasis added]"). Stein, the broker, wrote to Levenson (in a cover note when he delivered the Insoft letter), "Norm, I *think* this time he's for real" (emphasis added), seeming also to appreciate that Insoft had not yet

nailed himself down inextricably. Indeed, the very purpose of the words "satisfactory to both parties," which carried special weight by virtue of having been inserted in writing in a typewritten letter, see *King Features Syndicate, Inc.* v. *Cape Cod Bdcst. Co.*, 317 Mass. 652, 654 (1945), was to ensure that Insoft would not be bound until Mr. Gerber had reviewed the purchase and sale agreement, strongly suggesting, in turn, that that was to be the decisive document.

Levenson argues that, if Insoft stopped short of binding himself to the sale, he nevertheless had a duty to negotiate in good faith the terms of a purchase and sale agreement and that he violated that duty. Reliance is put on *Druker* v. *Roland Wm. Jutras Assocs., Inc.*, 370 Mass. 383, 385 (1976), where it is said, quoting from *Uproar Co.* v. *National Bdcst. Co.*, 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936), that "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." Here, however, there was no contract of which the implied covenant could be a part; the principle of the *Druker* case has no application. Insoft's guarantee was, in effect, an illusory promise.

*Judgment affirmed.*