Fabricant, J.
Introduction
This suit arises from a failed real estate transaction, in which the plaintiff was to purchase a residential condominium unit from the defendants. After the defendants had accepted the plaintiffs offer, but before the parties had come to terms on all provisions of a purchase and sale agreement, the defendants terminated the negotiations. The plaintiff claims breach of contract and violation of G.L.c. 93A. She seeks specific performance, as well as multiple damages and attorneys fees. Presently before the Court are the parties’ cross-motions for summary judgment; the plaintiff seeks summary judgment as to liability only, while the defendants seek summary judgment on the entire complaint. For the reasons stated, the defendants’ motion is granted.
Facts
The voluminous materials submitted by both sides present a set of facts that is detailed and intricate, and that includes some disagreement on minor points, but that in all material respects is undisputed. The real estate in issue is a condominium unit in a 42-unit residential building in Brookline, known as the Colonial Arms. The plaintiff, a psychiatric nurse who was at one time licensed as a real estate broker, has been a tenant in the unit since October of 1973. Until 1993, the building was a rental apartment complex, subject to the Brookline rent control by-law. The defendants acquired the property as trustees in 1989, and converted it to a condominium on March 1, 1993.
Negotiations between the parties began in the Spring of 1992, when the defendants informed the building’s tenants of their intention to convert the building to a condominium. At that time a group of tenants, including Abrams, hired counsel, funded partially by the defendants, to represent them in their efforts to purchase the units in which they resided. Abrams and others first made offers in August of 1992. Abrams proposed a price for her unit of $55,000, conditioned on numerous specified improvements to the common areas and to the unit. The defendants rejected her offer and those of the other tenants.
Upon the creation of the condominium on March 1, 1993, the defendants presented the tenants, including Abrams, with written proposals. The defendants’ offer letter to Abrams at that time proposed a price of $75,000, and attached a complete proposed purchase and sale agreement specifying all terms of the transaction.[2] Abrams did not accept the defendants’ offer at that time. On July 15, 1993, however, Abrams, through attorney Donald Solomon, presented a counter-offer to purchase the unit at the $75,000 price, but under a substantially revised purchase and sale agreement, which Solomon forwarded with the offer and a deposit. This stimulated negotiations, which proceeded without success until August 12, 1993, when the defendants’ counsel, Carolyn Partan, returned Abrams’s deposit.
In mid-October 1993, Abrams and defendant David Chase conferred directly by telephone and reached agreement on a purchase price of $79,350, without discussing other terms. Solomon followed up with a *280 letter to Partan, expressing a change in position on one of the issues that had previously been under discussion, and referring back to previous correspondence regarding other outstanding issues. Solomon enclosed “a complete set of our current rider proposals for your information.”
On or about November 3, 1993, Abrams, through Solomon and Partan, asked the defendants to sign an offer to purchase form so that she could make immediate application for mortgage financing, in order to take advantage of favorable interest rates that were then available. Partan filled in a copy of the Greater Boston Real Estate Board’s standard form “Offer to Purchase Real Estate.” She made one change in the pre-printed form language, striking the provision that the parties would execute “the applicable Standard Form Purchase and Sale Agreement recommended by the Greater Boston Real Estate Board or any form substantially similar thereto,” and substituting “a mutually satisfactory Purchase and Sale Agreement.”[3] Chase, as trustee, and Abrams then signed the offer form. Abrams submitted a deposit, which was placed in escrow.
As executed, the offer form identifies the unit, with a parking space identified by number, and indicates that the unitwill be conveyed “with storage area." The form does not identify the storage area to be included. The form states the price, broken down into an initial deposit paid with the offer, an additional deposit to be paid upon execution of a purchase and sale agreement, and the remainder to be paid at closing. It sets a deadline of November 12, 1993, for the execution of “a mutually satisfactory purchase and sale agreement which, when executed, shall be the agreement between the parties hereto.” It also sets a date of January 4, 1994, for the closing, and provides that “time is of the essence hereof.” At the bottom of the form, below all the information regarding the terms of the buyer’s offer, and before the place for the seller to sign acceptance, the pre-printed form states “NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.”
It is this executed offer form that Abrams now contends constitutes the contract that defendants have breached. Thus, the parties’ intentions in executing it are of particular importance. Both Abrams and Chase were questioned at length on the subject at their depositions. Chase testified that his understanding was that the executed offer form obligated the trust to convey the unit, “subject to a mutually satisfactory purchase and sale,” and to negotiate with her or her representatives in good faith to the end of “providing a P&S acceptable to both parties.” Abrams testified that she considered herself bound to purchase the unit “not under any terms, but under mutually agreeable terms.” Partan, at her deposition, testified that “It was my expectation that we would work towards that mutually satisfactory purchase and sale agreement.”
After execution of the offer form, negotiations continued regarding the issues that had already been identified as outstanding. These included provisions relating to the rights of tenants to lease out parking spaces; certain repairs and improvements that Abrams sought to have the defendants make both to the unit and to the common areas; security for the planned improvements to the common areas (Abrams proposed a hold-back of funds from the purchase); the provision to Abrams by the defendants of documentation of the results of inspections for termite infestation and for fuel oil contamination, or alternatively indemnification agreements for those conditions; alteration of the condominium’s by-laws to accommodate Abrams’s cats and in certain other respects; identification of the storage area or areas to be included; and certain improvements that Abrams sought to have the trust make to the storage areas. The outstanding issues relating to improvements and repairs had economic implications, in defendant Chase’s estimation, in the range of $5000 to $6000 for the proposed improvements to the unit, and $15,000 for the proposed improvements to the common areas. As the negotiations on these points continued, the parties executed written agreements to extend the deadline for execution of a purchase and sale agreement first to November 16, then to November 19, and then to November 30. Each written extension provided that “time is of the essence.”
The course of negotiation was characterized, in defendant Chase’s perception, by Abrams repeatedly raising new demands, most of which he ultimately accepted at least in substance. The series of correspondence submitted in support of the defendants’ motion tends to bear out this perception. Despite this pattern, by the week of Thanksgiving, all issues had been at least tentatively resolved[4] with the exception of the storage area. Abrams was then using three separate, non-contiguous storage areas in the basement of the building. She wanted to retain an equal amount of space, but preferred one large area or contiguous areas.[5]
On the Friday after Thanksgiving, November 26, 1993, Abrams and Chase met personally to tour the basement and identify a storage area or areas to be included in the transaction. Abrams identified space no. 16, which was then occupied by another tenant, as her preferred space. According to Abrams’s deposition testimony, Chase’s reply was “I don’t see that that’s any problem.” As Abrams testified, Chase indicated that if she were to have no. 16, which was larger than the others, he would not provide new framing and shelving, as he had earlier indicated a willingness to do if she were to have the spaces she was then using. There was also discussion, according to Abrams’s deposition, of her continued use of one of the spaces she was already using in addition to no. 16; she wanted the use of the additional space for as long as she owned the unit, while Chase was willing to let her *281 use the additional space only “until such time as he might want it.”
Chase’s understanding of what he agreed to in this meeting, as expressed in his deposition testimony, was that the trust would attempt to persuade the other tenant to move from storage area no. 16; he believed that the trust had no power to compel that tenant to do so, based on the Brookline rent control by-law. Sometime after this meeting (the record does not indicate precisely when) Chase directed the building manager to inquire as to the willingness of the tenant then using space no. 16 to move to another storage area.
On Monday, November 29, 1993, Solomon, on behalf of Abrams, sent Partan a letter stating that Abrams and Chase had agreed that storage area no. 16 “will be conveyed to Ms. Abrams and the tenant will be directed to move elsewhere.” The letter went on to suggest that notice be delivered to the other tenant the next day, so as to provide a full month’s notice prior to closing. The letter also presented the same additional requests that, according to Abrams’ deposition testimony, Chase had already rejected: that the trust re-frame the walls of storage area no. 16 and build shelving, and that she be allowed to retain one of the storage areas she was already using “for as long as she remains the apartment owner.”
Partan was on vacation on November 29, and did not receive Solomon’s letter until the next day, November 30, the deadline then in effect for the execution of a purchase and sale agreement. Partan faxed a copy of the letter to Chase. Chase’s reaction, as he testified at his deposition, was that “the contents of the letter I felt did not reflect the conversation . . . and was nothing but another in a continuing litany of seemingly small changes." Partan and Chase discussed the letter. According to Partan’s deposition testimony, Chase “was frustrated,” but remained willing to continue to negotiate. Chase, at his own deposition, testified that he terminated negotiations with Abrams based on this letter,[6] because “(w]e never knew what was truly acceptable and as seller we were tiying to craft the document that would be acceptable and could get signed, but the terms of this kept changing, and this letter is just another change.”
On the afternoon of November 30, Partan spoke with Attorney Solomon, and communicated the substance of what she understood to be Chase’s position at that time: that the trust would not evict the other tenant from the storage area, but would seek to persuade that person to move, that the trust would not build shelving or re-frame the storage area, and that Abrams could keep another storage area only until the trust needed it. Solomon did not withdraw the requests that Partan indicated were unacceptable to the trust, and did not indicate that Abrams would accept a storage area or areas other than no. 16.[7] Regarding whether another extension would be executed, Partan testified at her deposition that “I told him that it was too late in the day for me to contact my client. . . and I explicitly remember him saying, ‘what do we do now?’ and I said that, ‘our clients can keep talking.’ They have talked in the past. We had offers expire in the past on this transaction and they had kept talking.” Partan’s understanding of this exchange, as expressed in her deposition testimony, was that there was no agreement to extend the time limit; nevertheless, she assumed that the parties would continue to negotiate despite the expiration of the offer, as they had done before.
Attorney Solomon’s deposition testimony does not contradict Partan’s account of the conversation between them on November 30. In his affidavit, however, he presents a different interpretation: “Partan requested additional time for Mr. Chase to talk informally with the other tenant about vacating her storage area ... In the course of this conversation, I was led to believe that there was no need to exchange further written extensions, since all parties were operating in good faith, the agreement was about to be signed as soon as Mr. Chase had a chance to speak with the other tenant, and there were no issues of substance separating the parties.”
On the evening of November 30, the building manager asked the tenant who was using storage area no. 16 to agree to switch to another area. The tenant indicated a need for time to consider the request. Sometime thereafter — the record does not indicate precisely when[8] — the tenant communicated a refusal to do so.
On December 3, 1993, Partan informed Solomon, by telephone and then by letter, that Chase was unwilling to negotiate any further.[9] Partan enclosed with her letter a check in return of Abrams’s deposit. Abrams, through Solomon, refused to accept the return of her deposit, and on January 28, 1994, sent Chase a demand letter under c. 93A. The trust’s response denied a violation of that statute, and this suit followed on March 17, 1995.
The Applicable Legal Standards
Summary judgment is appropriate when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974); see also Nashua Corp. v. First State Ins. Co., 420 Mass. 196, 202 (1995); Wheatley v. American Telephone & Telegraph Co., 418 Mass. 394, 397 (1994); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). A moving party can show entitlement to summary judgment by demonstrating that the opposing party “has no reasonable expectation of proving an essential element of that party’s case,” even without affirmatively negating an element of the opposing party’s claim. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715-16 (1991).
*282 Discussion
Here, the parties agree that there is no genuine issue of material fact. They disagree strenuously, however, on the applicable principles of law. The plaintiffs position is that the accepted offer to purchase, memorialized in the executed offer form, was a complete contract, binding the defendants to convey the property. For this proposition the plaintiff relies on Goren v. Royal Investments, Inc., 25 Mass.App.Ct. 137 (1987), in which the Appeals Court held that an executed offer form that was the product of active negotiations, and that contained all material terms of the transaction, was binding in contract. As a fail-back position, the plaintiff contends that the executed offer form at least bound the parties to negotiate in good faith, and that the undisputed facts establish that the defendants failed to do so. The defendants, relying on Levenson v. L.M.I. Realty Corp., 31 Mass.App.Ct. 127 (1991), and Blomendale v. Imbrescia, 25 Mass.App.Ct. 144 (1987), argue that the offer imposed no binding obligation whatever, not even an obligation to negotiate in good faith, because it did not contain all material terms, and it expressly contemplated the subsequent execution of a complete agreement. The defendants further contend that their conduct, as established in the summary judgment record, meets any applicable requirement of good faith.
As the Appeals Court observed in Levenson v. L.M.I. Realty Corp., 31 Mass.App.Ct. at 130, “(t]he norm in real estate transactions has been that, where the parties sign a writing contemplating the later execution of a purchase and sale agreement, they do not intend to be bound until that time . . . But the norm is not monolithic . . . The controlling fact... is always the intention of the parties.” (Citations omitted.) Here, unlike in Goren, supra, the writing itself, the state of the negotiations as of the date of its execution, and both parties’ subsequent testimony as to their intent, make it clear that the executed offer form was not intended to bind the parties to complete the transaction. That the executed offer form did not contain all material terms seems virtually obvious from the facts recited above. The conduct of both parties throughout the lengthy course of negotiations, beginning in 1992, establishes beyond question that aspects of the transaction other than price and timing were of great importance to both sides. Yet none of these terms was addressed in the writing, and virtually all of them remained unresolved as of its date. As noted above, these unresolved issues included the rights of tenants to lease out parking spaces; repairs and improvements to be made both to the unit and to the common areas; security for the planned improvements to the common areas; documentation of the absence of, or indemnification against, termite infestation and fuel oil contamination; alteration of the condominium’s by-laws; and identification of the storage area and improvements to it. Moreover, the testimony of both parties makes it clear that they did not intend to be bound to complete the transaction without satisfactory resolution of those issues.
It does not necessarily follow, however, that the executed offer form gave rise to no obligation at all. As noted supra, it is the intent of the parties that governs. Here the deposition testimony of the parties is remarkably consistent; both understood that they were binding themselves to negotiate in a good faith effort to reach a mutually satisfactory purchase and sale agreement. The writing itself reflects that understanding, in its capitalized warning that it “creates binding obligations.”[10] Thus, while the executed offer form did not bind the parties to complete the conveyance, it was nevertheless a contract, binding the parties to negotiate in good faith.
The defendants argue, based on Schwanbeck v. Federal-Mogul Corporation, 412 Mass. 703, 705-06 (1992), and Levenson v. L.M.I. Realty Corp., 31 Mass.App.Ct. at 131, that an agreement merely to negotiate can have no binding force. The cases, however, are distinguishable. In Schwanbeck, the writing expressly stated that it did not create “any binding legal obligation whatever,” before going on to state each party’s “intention immediately to proceed in good faith in the negotiation of such binding definitive agreement." 412 Mass. 705, n.2. In context, the Supreme Judicial Court construed the “good faith negotiation’’ provision as expressing only a statement of present intention, and not a binding obligation. Here, the writing contains no comparable express disclaimer; indeed the pre-printed language on the form is to the opposite effect.
In Levenson, 31 Mass.App.Ct. 131, the seller signed a letter setting forth the terms of an offer he would accept. When the buyer presented an offer meeting those terms, the seller refused it. The Appeals Court held that the seller’s letter was not itself an offer so as to give rise to a power of acceptance, so that the two writings together did not constitute a contract. Since there was no contract, the court held, there was no “implied covenant of good faith and fair dealing,” such as exists in every contract. Here, there clearly was offer and acceptance, and thus a contract. Thus, the cases cited present no bar to enforcement of the contract according to the intent of the parties — that is, as binding them to negotiate in a good faith effort to reach a mutually satisfactory purchase and sale agreement.
The undisputed facts, however, establish that the defendants did so. From November 3rd until at least sometime on November 30th, the defendants demonstrated substantial patience and flexibility in accommodating the plaintiff on a long list of demands that went well beyond the terms of the accepted offer, that repeatedly escalated, and that exceeded the terms of any other sale to a tenant. In the process, the defendants granted three extensions of the deadline for execution of a purchase and sale agreement. On the day of the final deadline, with no document ready for execution and no extension requested (at least not explicitly), the plaintiff presented additional demands, some of which the defendants had already rejected. The plaintiff did not withdraw those additional de *283 mands, or communicate a willingness to execute an agreement without acceptance of them. In this context, defendant Chase decided that he had had enough.[11] Both parties allowed the deadline to pass without executing any extension, the plaintiff apparently assuming that the negotiation would continue anyway,[12] and thereafter the defendants declined to negotiate further.
That these facts do not amount to bad faith is apparent on comparison with the facts in Goren, 25 Mass.App.Ct. 138-39. There, after executing written acceptance of an offer containing all material terms, the seller received a higher offer. The seller then “became inattentive” to the buyer’s calls. When the buyer tendered a signed purchase and sale agreement incorporating the terms already stated in the executed offer, the seller refused it, stating as its ground a misrepresentation of fact concerning removal of a tenant. The seller then entered into a purchase and sale agreement with the other buyer that was not materially different from the one tendered by the plaintiff, except for the price. On those facts, the trial judge found the seller’s refusal to have been “motivated entirely by the increased financial benefits” it would obtain from accepting the subsequent offer. It was on this basis that the Appeals Court affirmed the judgment for the buyer.
Here, there is nothing whatever in the record to suggest any ulterior motive on the part of the trust. There is no evidence of any subsequent higher offer; on the contrary, the record establishes that Abrams still lives in the unit as a tenant.[13] In essence, the facts show a good faith effort to reach agreement, extended even past three deadlines, concluding in a simple loss of patience. With the benefit of hindsight and distance, one could question the decision to terminate the discussion at that point, rather than to proffer a final offer. But good faith does not require objective reasonableness, or even cool-headedness. Rather, it requires only honesty and the absence of subterfuge. Here, the facts establish that that standard was met.
ORDER
For the reasons stated, it is hereby ordered that the defendants’ motion for summary judgment is ALLOWED. Judgment shall enter for the defendants forthwith.

 The letter characterized the price offered as a 40% discount from market value. Attorney Solomon’s demand letter under G.L.c. 93A, dated January 28, 1994, estimates market value as of that date at $123,000. Defendant Chase has filed an affidavit, dated April 17, 1996, stating that “since being released from the restrictions of rent control on January 1, 1995, I estimate that the fair market value of the Unit has roughly doubled, from about $80,000 to about $160,000.”

 Partan testified at her deposition that “I was very careful to make it mutually satisfactory because I knew that there were issues still outstanding.”

 The correspondence indicates that language had not yet been agreed to relating to improvements to the common areas, and that the parties had yet to identify an engineer who would certify completion of that work.

 There is some conflict in the record as to previous proposals on this point. Partan testified at her deposition that Abrams could have any vacant storage area, and that at earlier stages in the series of negotiations, Abrams had rejected various proposals regarding the assignment of a storage area to her. Chase, at his deposition, testified that Abrams could have any vacant storage area, but that she had not agreed to any other than no. 16. Abrams has submitted an affidavit stating that the defendants had rejected her various previous proposals regarding the storage area. Chase and Partan both acknowledged at their depositions that the trust never provided Abrams with a written proposal identifying a particular storage area.

 Abrams construes this testimony to mean that Chase decided on the day he received the letter, November 30, to terminate negotiations. That inference is not unreasonable, but neither is it compelled by the testimony, which does not say when Chase made the decision, only that it was based on the letter. In response to a request for admission, Chase stated that he made the decision on December 2. Partan testified at her deposition that the negotiations broke down on “Thursday or Friday.”

 Abrams states in an affidavit, dated March 25, 1996, that “If I had known on November 29, 1993, that defendants did not intend to extend the date for the signing of the purchase and sale agreement, I would have executed a purchase and sale agreement with the then agreed upon terms on that day. ” She does not say that she communicated her willingness to do so to anyone at the time.

 Chase says in an answer to an interrogatory that it was “after I terminated negotiations with Ms. Abrams.”

 In her deposition, Parian testified that it was her understanding that “the final straw” was a telephone call Abrams made to Chase on December 2, 1993, requesting still further concessions. Abrams has submitted an affidavit, dated May 10, 1996, stating that she did telephone Chase on December 1st or 2nd, but left a message only inquiring about the status of storage area no. 16, and made no mention of any common area improvements. The summary judgment record contains no testimony or affidavit from Chase on the subject.

 It seems likely that this warning, pre-printed on a standard form commonly used for residential transactions, is intended to alert the buyer, who might be a relatively unsophisticated consumer, that he or she is placing a deposit at risk, rather than to alert a person in the position of these defendants of legal consequences. Nevertheless, it is difficult to imagine how a seller could take the position that a default of some kind by the buyer could warrant forfeiture of the deposit, while at the same time contending that the seller has assumed no obligation at all.

 As noted supra, the inference the plaintiff seeks to draw, that Chase made this decision on November 30th, is not compelled by the deposition testimony. Nevertheless, viewing the facts in the light most favorable to the plaintiff for purposes of this analysis, the Court assumes that he did so.

 Abrams asserts, based on Attorney Solomon’s affidavit, that defendant Chase requested additional time. Solomon’s affidavit, however, does not say that Chase did so, nor does anything else in the record. Rather, Parian’s deposition testimony is the only direct account in the record of the conversation between her and Solomon on November 30th, and it is clear from her account that she made no such request. The effect of Solomon’s affidavit is not to contradict Parian, but to express his subjective understanding of her words. That he misunderstood, even if understandably so, does not show bad faith on the defendants’ part.

 Abrams hints at an ulterior motive, without actually arguing it, by pointing out that the trust still has not completed certain common area improvements it had agreed to undertake, and that the deal she had negotiated was the only *284 one among the tenants to include a hold-back as security for the completion of those improvements. Her theory, apparently, is that Chase changed his mind about those provisions, and called off the whole deal in order to get out of them. The problem with this theory is that Chase could have gotten out of those provisions without calling off the deal; prior to having signed any agreement containing those terms, Chase remained free to refuse to execute a purchase and sale agreement containing them, while remaining willing to execute an agreement without them.