van Gestel, J.
These matters[2] are again before the Court, this time on a second phase of the motions of the parties for summary judgment. The parties disagree over the interpretation of language in a June 1, 1998, letter agreement (“Letter Agreement”). Earlier, all parties argued that the contract language in question was unambiguous and, therefore, that they each were entitled to judgment as a matter of law. Although the language of the Letter Agreement was simple, because its interpretation by the Court seemed to present genuine issues of material fact regarding the parties’ intent, all motions were denied. See Memorandum and Order on Parties’ Cross Motions for Summary Judgment, dated December 21, 2000, full familiarity with which is assumed. Sensing the significance of the interpretation of the contractual language to the ultimate resolution of these cases, the Court scheduled a limited bifurcated evidentiary hearing in aid of that purpose.
BACKGROUND
The background materials that follow are taken from the parties’ previous filings in support of and opposition to the several motions for summary judgment, and from the testimony, exhibits, briefs and arguments presented at and after the evidentiary hearing conducted between February 20 and February 23, 2001.
MATEP LLC and Medical Area Total Energy Plant, Inc. (collectively, “MATEP”) are the owners and operators of the Medical Area Total Energy Plant, an energy-gen erating plant and distribution system that provides electricity, steam and chilled water to, among others, the five plaintiffs in these cases: Beth Israel Deaconess Medical Center, Inc.; The Brigham and Women’s Hospital, Inc.; The Children’s Hospital Corporation; DanaFarber Cancer Institute, Inc.; and Joslin Diabetes Center, Inc. (collectively, the “plaintiffs" or “users”). The plaintiffs are hospitals and educational institutions in Boston’s Longwood Medical Area.
MATEP was originally constructed and owned by Harvard University (“Harvard”). By the summer of 1997, Harvard was preparing to sell MATEP. As a result, Harvard and the plaintiffs negotiated, and on October 31, 1997, executed, what was called the Third Amendment to the Restated Utilities Contracts (“RUCs”). The purpose of the Third Amendment was, among other things, to address the impact of the then-impending deregulation of the Massachusetts electricity market on the prices to be charged by MATEP to the users for electricity under their contracts.
For many years prior to May 1998, MATEP had sold electricity to the users at rates corresponding to those charged by the Boston Edison Company (“Edison”). The Third Amendment made certain changes in the way that the users paid for electricity. Under it, the price for electricity would change from the Boston Edison G-3 rate to the price of alternative suppliers of electricity upon the satisfaction of the following four conditions:
(1) that a competitive market for energy exists;
(2) that alternative supplies of electricity at comparable levels of service to that provided by MATEP and with specifications and reliability standards at least equal to those provided for in the contracts with MATEP are actually available;
(3) that, in the absence of the contracts with MATEP, the users could contract for and obtain delivery of such alternative supplies of electricity under Arm, non-interruptibie agreements; and
(4) that delivery of such alternative supplies of electricity is not prohibited by law.
While the Third Amendment was being negotiated between Harvard and the plaintiffs, Advanced Energy Systems, Inc. (“AES”) was selected by Harvard as the likely purchaser of MATEP. The plaintiffs in these cases, as users of the MATEP system, had certain approval rights regarding any sale by Harvard of the facility.
At the time leading up to the closing of the sale from Harvard to AES, it became known that PECO Energy Company (“PECO”),[3] which had not previously provided electricity in Massachusetts, had entered or was about to enter the market. In the spring of 1998, the plaintiffs here, as users of MATEP electricity, requested that AES, as the future owner, agree to match the price and other terms offered by PECO to members participating in the Power Options Program.[4]
Under the Power Options Program, participants would remain customers of their local utility company from the date they entered into agreements with PECO until PECO converted their electricity accounts to service from it. This conversion would not occur until some time after the favorable resolution of a referendum on electric deregulation on the Massachusetts ballot in November 1998.
The plaintiffs’ request that AES agree to match the PECO price resulted in four meetings that occurred on March 31, April 9 and 16, and May 13, 1998, among *597 the users and their counsel. Harvard, and AES. Initially, AES had concerns about whether the PECO proposal met the comparability conditions of the Third Amendment to the RUCs. In essence, AES was concerned about whether the PECO proposal was a “real deal,” meaning: was PECO actually going to provide electricity, or was it just a financial scheme? And, if PECO was truly going to supply electricity, would it be supplied in a manner comparable to that supplied to its users by MATEP? These, and other issues, were unsuccessfully negotiated at the first three of the meetings, with agreement only arriving at and after the fourth. The impending closing of the Harvard/AES transfer of MATEP played some role in the parties’ resolution of the PECO pricing issue.
The issue of comparability was in part ameliorated when it was learned that Massachusetts General Hospital, New England Medical Center and St. Elizabeth’s Hospital were each signing up with PECO. To the extent comparability remained in play, it was swallowed up in the “real deal” versus “financial deal” debate.
At the first three meetings among the users, Harvard and AES, the discussion focused on how to sort out real offers of electricity from solely financial arrangements. All parties wanted to agree on a simple test, but they differed on what that test would be. AES advanced a majoritarian approach, insisting that PECO must “deliver” electricity to a majority of all of HEFA’s participating institutions. The users, on the other hand, argued for a test involving only a reference group of similar medical institutions. This impasse continued through the March and April meetings.
At the May 13, 1998, meeting, AES broke the log-jam when it presented a draft Letter Agreement that, with minor changes, became the ultimate Letter Agreement of June 1, 1998. AES essentially accepted the users’ approach. The essence of the Letter Agreement entered into between AES and the plaintiffs is that if electricity from PECO became actually available to certain designated hospitals listed in Exhibit B thereto that had signed on to receive electricity under agreements with PECO, MATEP would charge its users the lower PECO rate for the period from June U 1998, through February 28, 2001. The Letter Agreement provides that it shall terminate in favor of MATEP “in the event that by April 1, 1999 . . . PECO has not commenced deliveries of electricity under a majority of the Two Year Agreements.” (Emphasis added.)
The parties also agreed that until April 1, 1999, the plaintiffs would pay MATEP the higher Boston Edison rate for electricity, but that any excess over the PECO rate would be held in an escrow account controlled by MATEP. The escrowed funds would be returned to plaintiffs if PECO commenced deliveries of electricity by April 1, 1999.
Claiming that the condition of the Letter Agreement has been met — i.e., PECO commenced delivery as required by April 1, 1999 — plaintiffs seek the return of the escrowed funds, which now total more than five million dollars. AES disagrees.
PECO signed certain Two Year Agreements (“Two Year Agreements”) to provide electricity to the “seven”[5] designated Massachusetts health institutions at rates that were lower than Edison’s. The Two Year Agreements with the designated hospitals provided that
PECO Energy agrees to supply . . . electric energy and capacity sufficient to provide firm, full requirements of Electricity for each Account, meaning supply of Participant’s total electricity at each Receipt Point supplied from external sources.
The designated hospitals all had numerous electric meters at a variety of different locations. By April 1, 1999, it appears that PECO had begun “delivering” electricity to some of the meters of at least five of the designated hospitals. The current dispute centers on whether this “delivery” of electricity to some of the meters at a majority of the designated hospitals satisfies the contractual requirement of “actually available.”
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact and the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The Letter Agreement provides the test for whether electricity would be “actually available” to be if PECO “commenced deliveries under a majority of the Two Year Agreements” by April 1, 1999. Although the parties all agree that “commence” means “begin,” they dispute the definition of “under a majority of the Two Year Agreements.” Plaintiffs contend that “commenced deliveries under a majority of the Two Year Agreements” means “begin delivery of electricity to a majority of the seven hospitals.” Consequently, because PECO had executed agreements to provide electricity to at least five of the designated hospitals by April 1, 1999, plaintiffs contend that under the plain language of the Letter Agreement, the test of “actually available” electricity has been passed.
MATEP responds that because the Letter Agreement specifically referenced the “Two Year Agreements,” and a sample Two Year Agreement was attached to each Letter Agreement, “actually available" must be considered in the context of both the Letter Agreement and the Two Year Agreement. MATEP thus argues that each of the designated hospitals that entered into a Two Year Agreement with PECO has several different electric meters in several different locations, and each Two Year Agreement listed every *598 meter or account to which electricity was delivered to that particular hospital. Consequently, MATEP contends that to satisfy the requirement of “actually available” electricity, PECO would have had to have begun delivery of electricity to every meter of a majority' of the designated hospitals by April 1, 1999. Unless service had commenced to every meter at a majority of the designated hospitals, MATEP maintains, the “firm, full requirements of Electricity for each Account” condition of the Two Year Agreements would not have been satisfied. In support of this interpretation, MATEP notes that the Two Year Agreements define “firm, full requirements” as “supply of Participant’s total electricity at each Receipt Point supplied from external sources.” Thus, MATEP argues that the electricity was not “actually available” unless PECO had begun to deliver electricity to every meter' (receipt point) at a majority of the designated hospitals by the target date.
These different interpretations of “under a majority of the Two-Year Agreements” revealed to the Court a genuine issue as to the parties’ intent at the time they entered into the Letter Agreement. “The intention of the parties, if made ambiguous by the words of the contract, generally presents a question of fact.” See Levenson v. L.M.I. Realty Corp., 31 Mass.App.Ct. 127, 130 (1991). Plaintiffs interpret “under a majority of the Two Year Agreements” as “to a majority of the seven hospitals,” while MATEP defines the same language as “to every meter at a majority of the seven hospitals.” Because the phrase “under a majority of the Two Year Agreements” might reasonably support either interpretation, this Court, in considering the original motions for summary judgment, found the wording to be ambiguous, and the ambiguity could not be resolved as a matter of law. It was this finding that resulted in the evidentiary hearing.
The resolution of the several motions here depends upon a proper interpretation of the language of the Letter Agreement. This is a question of law for the Court. Lumber Mut. Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). “In the absence of an ambiguity, [a Court] will ‘construe the words of the [contract] in their usual and ordinary sense.’ ”116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Company, 433 Mass. 373, 376 (2001). The mere fact that parties disagree on the proper construction of contractual language does not necessarily establish an ambiguity. Lumbermans Mut. Cas. Comp. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
A contract is to be read in light of the circumstances of its execution, which may enable a Court to see that its words maybe understood or, in the alternative, are actually ambiguous. Robert Industries, Inc. v. Spence, 362 Mass. 751, 753 (1973). When an element of ambiguity appears in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Judges have no roving writ to construe contractual language in a way that they think best. Exxon Corp. v. Esso Workers’ Union Inc., 118 F.3d 841 (1st Cir. 1987). Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to construction of a written instrument. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
There is no question that PECO’s Two Year Agreements with the designated hospitals require it to supply them with “electric energy and capacity sufficient to . . . provide firm, full requirements of Electricity for each Account, meaning supply of Participant’s total electricity at each Receipt Point supplied from external sources.” The Court, initially, had trouble with the meaning of that language. At a minimum, a determination might depend upon numerous evidentiary factors, including the intent and practice of the parties and industry custom.
The evidentiary hearing, following the summary judgment arguments and filings, however, has provided the Court with information that enables it to resolve the parties’ disagreements. This comes not from a study of the PECO Two Year Agreements, however, but rather from a newfound appreciation of what was said, and not said, about the meaning of the word “deliveries” as it relates to electricity as used in the Letter Agreement.
The test to determine “actual availability” agreed to by AES and the users in the Letter Agreement had as its purpose to create a simple way of determining whether PECO’s participation in the Power Options Program with HEFA’s members was a “real deal” or just a “financial deal.”[6] The selected language — "commenced deliveries of electricity" — was authored by AES and was included in its draft of the Letter Agreement first presented by its counsel at the May 13, 1998, meeting. The language used, however, was never changed and was not discussed; everyone present was quite content that they understood exactly what it meant. No one testified to attributing any special industry custom or meaning to the words. In fact, however, everyone employed a word that did not comfortably fit the situation.
It has become clear to this Court from the evidentiary hearing that the word “deliveries” was miscast. What all of the parties really intended was a word or words that would better reflect what actually happens in the real world of electric power generation and from *599 what source and in what manner the watts actually arrive at the user.
Only one witness presented testimony and evidence about the way that electricity is made available to users. This witness was Douglas Stevenson (“Stevenson”), owner of Energy Options Consulting Group, LLC, a man with extensive credentials and experience in the electric power industry, and whom the Court found to be wholly credible.
Stevenson used the analogy of a lake[7] to explain the provision of electricity. He described how a power company like PECO “pours” electricity into a large common “lake” — in the power industry, the lake is called the grid — and “delivers” electricity when its customers (to whom it is contractually obligated and for whom it is financially responsible) draw electricity out of the “lake,” or grid. Within one hour of electricity being drawn by a PECO customer from the grid, PECO must “replenish” the amount drawn by its customer either by “pouring" in more of its own electricity or by purchasing electricity from others to be “poured” in. In assessing this process, one can readily see why the word “deliveries” is not the best choice for describing this function.
In the electric industry, customers become “enrolled” by electricity producers. When a new producer, like PECO here, comes into an area already served by a local power supplier, the enrollment process can take about a month to complete. This is because of the connection between enrollment and the reading of electric meters. Only approximately 5% of all meters are read on any given business day. There being about twenty business days in a month, it takes about a month for a complete changeover from one supplier, like Boston Edison and Massachusetts Electric here, to another, like PECO here.
Once a customer has been enrolled by a new power supplier, the fact of that enrollment is expressed on the next bill from the old supplier. Here, for example, the Boston Edison bill to Beth Israel Health Care in Chelsea, dated March 19, 1999, recited: “YOUR NEXT BILL WILL REFLECT SUPPLIER SERVICES FROM EXELON ENERGY.” Similarly, the Massachusetts Electric bill to Nashoba Community Hospital, dated March 26, 1999, bore the notation: “OUR RECORDS INDICATE THAT YOU HAVE SWITCHED YOUR SUPPLIER OPTION TO HORIZON ENERGY, DBA EXELON ENERGY.” Each of the foregoing examples were bills for electricity “delivered” by the old suppliers prior to the end of March 1999. The next bills reflect electricity “delivered” by PECO “commencing” before April 1, 1999.
Stevenson provided evidence that starting in the first two weeks of March 1999, PECO began enrolling the eligible accounts for the designated reference hospitals, and that before April 1, 1999, five of those hospitals had 100% of their eligible accounts enrolled with PECO. Once an account was enrolled with PECO, starting with the next meter reading. PECO became responsible for “delivering” electricity to that account by “pouring” electricity into the grid and for “settling up” for that account’s withdrawals from the grid.
Stevenson provided evidence that six of the designated hospitals began “receiving” electricity from PECO before April 1, 1999, and that, by April 15, 1999, at the end of the monthly meter cycle, all accounts at five of the designated hospitals were “receiving” from PECO. During the first month alone, PECO was credited with delivering 400 million watt hours of electricity to the designated hospitals, and during the first year an estimated 29 billion watt hours. This was conceded by the President and Chief Operating Officer of AES to be the delivery by PECO of a “substantial amount” of electricity to the designated hospitals.
PECO’s participation in the Power Options Program with the designated hospitals was clearly shown to be a “real deal.” By April 1, 1999, PECO had commenced “deliveries” of electricity to six of the designated hospitals and had enrolled 90% of the eligible accounts at all of the designated hospitals. Thus, this Court rules that a proper understanding of the method by which electricity is “delivered” through the grid in Massachusetts mandates a conclusion that electricity from PECO became “actually available” to a majority of the designated hospitals by the beginning of “deliveries” under a majority of the PECO Two Year Agreements by April 1, 1999.
What was in issue here were not the details of PECO’s Two Year Agreements, but rather whether PECO actually provided electricity or instead was only-involved in exchanging money. The language the parties chose — "commenced the deliveries of electricity under a majority of the Two Year Agreements" — had no other limiting words. The Letter Agreement itself defined references to “a majority of the Two Year Agreements” to mean “a majority of those Two Year Agreements set forth on Exhibit B.” Exhibit B merely listed the names of “seven” hospitals. Thus the “deliveries of electricity” were to designated hospitals, not to certain unidentified or undefined accounts or meters at those hospitals. “Accounts” and “meters" were never a topic of any discussion among the parties, but comparable hospitals always were. This Court cannot, nor should it, add language to the Letter Agreement relating to “meters” or “accounts” that the parties themselves chose not to include. H.W. Golden & Sons v. Marblehead, 68 F.2d 875 (1st Cir. 1934).
ORDER
This Court finds, on the narrow issue of the parties’ intent as to whether electricity from PECO was “actually available” as contemplated in the test included in the several Letter Agreements of June 1, 1998, between the plaintiffs and MATEP, that a proper interpretation of those Letter Agreements mandates a conclusion that electricity from PECO would become “actually available” — as the evidence shows it did — on *600 or before April 1, 1999, by PECO’s enrollments and beginning of “deliveries” pursuant thereto of electricity to a majority of the hospitals designated on Exhibit B. As a consequence, the plaintiffs are entitled to recover their respective pro-rata shares from the escrow account.
The plaintiffs’ several motions for partial summary judgment are ALLOWED insofar as they relate to all issues of liability as set out in their several complaints and as to Count I of the defendants’ counterclaims.
To the extent that the defendants press cross motions for summary judgment they are DENIED.

 Four other actions against the same defendants have been consolidated for essentially identical summary judgment motions: The Brigham and Women’s Hospital Inc. v. MATEP LLC, et al. (Civil Action No. 99-4531 BLS); The Children’s Hospital Corporation v. MATEP LLC, et al. (Civil Action No. 99-4532 BLS); Dana-Farber Cancer Institute, Inc. v. MATEP LLC, et al. (Civil Action No. 99-4533 BLS); and Joslin Diabetes Center, Inc. v. MATEP LLC, et al. (Civil Action No. 99-4534 BLS). Each of the plaintiffs executed an identical Letter Agreement.

 PECO does business in Massachusetts through a subsidiary, Horizon Energy, d/b/a Exelon Energy. This memorandum uses “PECO” to refer to all of its entities doing business in Massachusetts.

 The Power Options Program was created by the Massachusetts Health and Education Facilities Authority (“HEFA”), and the program had as its purpose securing electricity supplies for its member institutions following deregulation of the electric industry.

 The “seven” hospitals were: Beth Israel Deaconess Medical Center; Beverly Hospital; Community Hospitals of Eastern Middlesex; Deaconess Nashoba Hospital; Deaconess Glover Hospital; Deaconess Waltham Hospital; Massachusetts Eye and Ear Infirmary; and New England Medical Center. The reason that eight, rather than seven, hospitals are listed in this footnote, is that there was an error in the list attached as Exhibit B to the Letter Agreement. Deaconess Glover Hospital and Deaconess Waltham Hospital, although wholly separate institutions, were listed as one: “Deaconess Glover Waltham Hospital." Nothing turns on this error.

 Implicit, of course, in agreeing to the test of “deliveries” to the designated hospitals is acceptance of the comparability issues, leaving only the “real deal” versus “financial deal” issue for resolution.

 A reservoir might have been even more apt.