[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff brings this motion in four counts, alleging in the first count, breach of a lease agreement; in the second count, promissory estoppel; in the third count, unfair and deceptive trade practices in violation of Connecticut Unfair Trade Practices Act (CUTPA), General Statutes Section 42-110a, et seq.; and in the fourth count, breach of the duty of good faith and fair dealing.
The facts are as follows: The plaintiff, Max Javit, is an experienced and successful entrepreneur in the business of commercial real estate. He is the owner of the Tri-City Plaza Shopping Center, in Vernon, Connecticut (hereinafter, the "Shopping Center"). That center consists of 283,000 square feet of retail space and 37 stores. In 1989 one of the anchor tenants was the Sage-Allen Co., Inc. department store which occupied about 30,480 square feet. CT Page 2442
In late 1989 a representative of the defendants Marshalls, Inc.; Marshalls of Vernon, Connecticut, Inc.; and Melville Realty Company, Inc. (hereinafter collectively "Marshalls") expressed an interest to Mr. Javit in the Sage-Allen space. Mr. Javit responded favorably because the Sage-Allen lease was to expire in the spring of 1993 and Javit knew Sage-Allen would not renew because it had already committed itself to move to the new and nearby Buckland Mall. Moreover, the Sage-Allen base rent of $1.50 per square foot, and with escalator clauses, its gross rent of $6.00 per square foot, were below the base rent of $8.00 per square foot Marshalls was willing to pay.
Negotiations led to Marshalls sending to Javit a "Business Deal," setting forth the economic terms of a proposed lease. It also stated,
 This business Deal does not constitute a binding offer on behalf of the Tenant; and Tenant, without prior notice, may cease negotiations at any time prior to a lease being fully executed and delivered.
When Javit accepted the basic terms, on March 21, 1990 Marshalls' attorney forwarded a draft lease to Javit of which Article XVIII, Section 16 of the draft lease stated:
 This Lease is transmitted for examination only and does not constitute an offer to lease, and this Lease shall become effective only upon the execution and unconditional delivery thereof by both parties hereto.
The attorney's cover letter said:
 Please be aware that the enclosed lease is just intended for discussion purposes and as such will not be deemed binding on Marshalls until a fully executed lease is delivered to you.
Plaintiff asked his attorney to review the lease, and since that attorney had previously negotiated a lease with Marshalls for another client, he requested of CT Page 2443 Marshalls' attorney that that lease be the basis of their discussions. Marshalls' attorney on May 10, 1990 forwarded that lease to plaintiff's attorney. It contained in Article XVIII at Section 17 the same provision as Section 16 in the earlier draft.
Meanwhile, Javit and Sage-Allen started to negotiate an early end of the Sage-Allen lease. On June 15, 1990 plaintiff and Sage-Allen executed a lease termination agreement that called for Sage-Allen's lease to end on January 31, 1991. Plaintiff, however, reserved the right to nullify the agreement at any time within 90 days after June 15, 1990.
On June 19, 1990 Javit, a Marshalls' representative, and the attorneys for the two parties met to resolve outstanding issues. They did not come to a complete agreement. But they came close enough for Marshalls to incorporate a Connecticut corporation, Marshalls of Vernon, CT, Inc., in anticipation of a consummated deal. On June 25, 1990, plaintiff waived the right to nullify the lease termination agreement with Sage-Allen.
Another draft lease was exchanged between plaintiff and defendants, again stating at Article XVIII, Section 17 that "this Lease shall become effective only upon the execution and unconditional delivery thereof by both parties." Plaintiff's attorney never objected to that provision.
During the summer, negotiations continued over the issues of environmental clean-up and Marshalls' continuous operation.
Finally, all matters having been resolved, Marshalls' attorney on September 4, 1990 forwarded four execution copies of a lease to plaintiff's attorney. The final version contained the same Article XVIII, Section 17 that had appeared in all previous drafts. The cover letter stated:
 Enclosed herewith for execution by the Landlord are four (4) copies of the Lease. Please have all copies of the Lease executed and notarized by the Landlord on the pages marked with tabs. CT Page 2444 I have also enclosed for your review red-lined pages of the Lease indicating the changes made from the last draft.
 In addition, I have also enclosed four (4) copies of the Side Letter relating to the Landlord's maintenance responsibilities prior to the Commencement Date. Upon full execution by the Landlord of the Lease and the Side Letter, please forward all copies to me and I will arrange for the Tenant to execute the Lease and Marshalls Inc. and Melville Realty Company, Inc. to execute the Guarantees. Upon full execution of the Lease and Side Letter, I will return two (2) fully executed copies of the Lease and Side Letter to your attention. In addition, I will also attach the final Site Plan as Schedule `A-1'
 It has been a pleasure working with you throughout this transaction and I hope that we can work together on another deal.
On September 11, 1990, plaintiff's attorney returned the four copies, executed by plaintiff, in the following letter:
 Please send me two fully-executed copies of each document as soon as possible. If there is any reason why you cannot return the documents to me within ten days from the date hereof, please call me immediately, as it is our client's requirement that this transaction be concluded no latter [sic] than September 21, 1990.
Marshalls, in the meantime, had been reconsidering their deal with plaintiff, along with a number of other deals, under a plan to reduce the number of their stores. Finally, they notified plaintiff that they were not going to locate in plaintiff's space. Marshalls never executed the lease.
Javit followed up on earlier inquiries from another tenant, T-J Maxx, Sons, successfully leasing moss of the Sage-Allen space to that tenant in March 1991 and the CT Page 2445 remaining space shortly afterwards to two smaller retailers. These combined leases are on terms not as favorable as the terms of the final draft of the Marshalls' Lease but much more favorable than the Sage-Allen lease.
 I.
Plaintiff's claim that Marshalls breached the lease agreement rests upon the premise that the parties entered into an enforceable lease. In this regard plaintiff relies upon the rule that when parties mutually consent to all the terms of an agreement, they are both bound even though they contemplate a written contract. As stated in Restatement (Second) of Contracts 27, "Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof." See also Williston on Contracts 4th ed. (1990) 4.8 pp. 298-300
Numerous courts recognize that the execution of a final document can be "no more than a formality intended to tidy up ministerial and nonessential terms of a bargain." Goren v. Royal Investments, Inc.,516 N.E.2d 173, 175 (Mass.App.Ct. 1987). As stated in that case, "If, however, the parties have agreed upon all material terms, it may be inferred that the purposes of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract." Id. at 175. To the same effect: Socony-Vacuum Oil Co., Inc. v. Elion, 126 Conn. 310, 317 (1940).
Plaintiff claims that in this case the evidence establishes that the parties had agreed on every single term of the lease they had been negotiating for months, final execution copies were sent by the defendants to the plaintiff who executed them and returned them for the pro forma signature of defendants. Under these facts plaintiff asserts an enforceable and binding agreement was reached.
The law also is, however, that even if the parties have had a meeting of the minds on all terms of a CT Page 2446 contract but intend "not to be bound until the formal document is executed, there is no contract until its execution by both parties." Corbin on Contracts, Rev. ed. (1993) 2.9, p. 151. This is the rule applied in the leading Connecticut case of Atlantic Terra Cotta Company v. Chesapeake Terra Cotta Company, 96 Conn. 88
(1921). In that case a plaintiff's proposal for the sale of architectural terra cotta to be used for the unglazed finish of an apartment house, was accepted by the defendants. The proposal provided it was "subject to formal contract." No such contract was entered into by the parties. The court held at p. 101:
 We find, therefore, that the written proposal of the plaintiff in condition one was expressed, in effect, to be subject to a formal written contract being prepared and executed, and that the mere acceptance by the defendants did not create a contract. It was essential to the creation of a contract that a formal written agreement should be executed in accord with condition one. This formal written agreement was a condition precedent to the completion of a contract,
In Schlott v. Zaremski, 32 Conn. Sup. 567 (1975) the appellate session of the Superior Court held that a binder for the sale of real estate, that contained a condition that it was subject to "a formal contract" being prepared and executed, indicated the parties did not intend to be bound until such a contract was executed and therefore, did not create a binding agreement.
In Fowler v. Weiss, 15 Conn. App. 690 (1988) the Appellate Court held that a binder of a sale of real estate that provided for a contract of sale to be signed on a specific date, which was never done, did not constitute an enforceable agreement.
See also Bendig v. Muirhead, 1 C.S.C.R. 1112 (Super. Ct. 1987).
R.G. Group, Inc. v. Horn Hardart Co., 751 F.2d 69
(CA.2d 1984) involved a franchise agreement between two major corporations that expressly provided that the CT Page 2447 entire agreement and any modifications be in writing. Despite the parties having reached a "handshake deal," the court found no enforceable agreement had been reached. The court summarized the law and its underlying policy as follows:
 Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs. . . . This rule holds even if the parties have orally agreed upon all the terms of the proposed contract. . . . On the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and [w]here all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document. . . . The point of this rule is give parries the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain `complete immunity from all obligations' until a written agreement is executed.
All the cases hold the intent of the parties, as to whether or not they shall be bound until there is a writing, is controlling and that intent is a question of fact for the trial court. Socony Vacuum Oil Co., Inc. v. Elion, supra, at 317. In Atlantic Terra Cotta, supra, our Supreme Court indicated that if the requirement of a writing was express and clear, "there is no occasion to resort to evidence of the attendant and surrounding circumstances to discover the intent of the parties as to whether or not a formal written contract was a condition precedent to the completion of a contract,. . . ." Id. at 99.
R.G. Group, Inc., supra, the Restatement of Contracts, Second, 27, Comment C., and Corbin on Contracts, Rev. ed. (1993), 2.9 at 159-160, all state that while primary weight must be given to a party's CT Page 2448 explicit statement that it reserves the right to be bound only by a signed, written agreement, in determining intent, regard may also be given to such factors as partial performance, the complexity of the transaction, the amount of money involved, and the norm in the trade.
In the instant case, each of the draft leases exchanged between the parties contained the provision that it was "transmitted for examination only and does not constitute an offer to Lease, and the Lease shall become effective only upon the execution and unconditional delivery thereof by both parties hereto." The plaintiff seeks to diminish the force of this language by arguing that while the reference to the leases being submitted for examination only, made sense during the early stages of negotiations, it was meaningless when it appeared in a final execution copy of the lease. Moreover, Marshalls' attorney's transmittal letter indicating that after plaintiff signed the leases, he would arrange for his client to execute them, reveals a clear intent of Marshalls no be bound and the signing to be a formality.
While these arguments aye forceful, they do not overcome the explicit language in Section 17 of the draft leases that "the Lease shall become effective only upon the execution and unconditional delivery thereof by both parties hereto." There is no evidence that defendants ever waived that requirement. Nor did plaintiff reject that language when it returned the signed copies to defendants. In Penner v. Equitable Real Estate Investment Management, Inc., 978 F.2d 770 (1st Cir. 1992), where a proposed agreement contained a provision similar to the one in the instant case, the court found significant that, "No rejection was ever made, however, of the disclaimer in Article 26, that neither party was obligated until a purchase and sale agreement was executed and delivered." Id at 772. See also R.G. Group, Inc., supra at 75.
Finally, the law clearly is that no binding agreement can exist if "at least one of the parties has expressed the intention not to be bound until the writing shall be executed." Williston on Contracts, 4th ed. (1990) 4:8, at 303. That is precisely the intention expressed by CT Page 2449 defendants in every draft of the lease.
Plaintiff points to his terminating the Sage-Allen lease before its expiration as evidence of his partial performance on the Marshalls lease. Part performance is recognized as "an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands the contract to be in effect." R.G. Group, Inc., supra at 75.
In the instant case, the plaintiff's termination of the Sage-Allen lease is at best ambiguous insofar as it relates to the parties' intentions to be bound by the draft lease. While plaintiff negotiated to free the Sage-Allen space so he could achieve a lease with Marshalls, he brought the Sage-Allen lease to an end before he had any firm assurance of a final agreement with Marshalls. Moreover, plaintiff was pursuing his own interests independent of the Marshalls potential lease, because the rental Sage-Allen was paying was below market rate, and Sage-Allen, by locating a new store in the Buckland Mall, was clearly not going to renew its lease.
Thus the court finds plaintiff's termination of the Sage-Allen lease does not constitute such part performance as to establish an intent either on his part, and certainly not on the part of the defendants, that the draft leases in the summer of 1990 were binding on both parties
Finally, the lease was the type of an agreement, because of its complex terms the amounts of money involved, and the practice of the trade, that the parties expected to be in writing and duly executed before it became binding on them. The lawyer who negotiated for the plaintiff testified at the trial to this effect.
Thus, this court finds as a fact that the parties did not intend to bound until the lease had been signed by both parties and unconditionally delivered. Since the lease was never signed by defendants, no binding lease came into existence, and plaintiff fails in his claim of breach of contract. CT Page 2450 II.
Plaintiff contends if the lease itself is actionable, then Marshalls' lawyer's letter of September 4, 1990, in which he forwarded the final drafts of the lease to plaintiff for signature and on their return, promised to arrange for Marshalls to sign, constituted an agreement to lease which defendants breached.
The law is an agreement to execute a lease can be binding when all the terms of the lease are agreed to, and nothing is left for future negotiations. 3 G. Thompson, Real Property, 1063 at 238. See, Annotation, "Requirements as to Certainty and Completeness of Terms of Lease and Agreement to Lease", 85 A.L.R.3rd 414.
In the instant case, an important provision of the lease was that it did not come into existence until it was signed and delivered. That provision was not fulfilled. Section 17 of the lease also provided it was not "an offer to lease." Moreover, while Marshalls' counsel promised to "arrange" for Marshalls to sign the lease, he did not promise his client would sign.
The same argument made by plaintiff here was rejected by our Supreme Court in Atlanta Terra Cotta, Co., supra. In that case after denying plaintiff's contract claim, the court addressed the claim that the memorandum of agreement constituted "a valid agreement to make a written contract." 96 Conn. at 99. The court rejected this argument, noting that the requirement that a formal contract be executed precluding a finding of an enforceable agreement to make a written contract. Id at 100-101.
 III.
Plaintiff contends that if he cannot prevail on his claim of breach of contract, or breach of an agreement to lease, he is entitled to recover under the doctrine of promissory estoppel. Under that doctrine, "a party may maintain a claim for damages based upon a promise which induces the other party's action or forbearance, if such CT Page 2451 action or forbearance is undertaken in reasonable reliance upon the promise." Finley v. Aetna Life 
Casualty Co., 202 Conn. 190, 205 (1987). Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 475; 1 Restatement (Second) Contracts (1981) 90.
Plaintiff claims Marshalls had given every indication through the long negotiations that they wanted the store up to the point when execution copies of the lease were transferred, and plaintiff reasonably relied upon defendant's manifestations of assent to the deal.
The weakness in that argument is that "[a] fundamental element of promissory estoppel is the existence of a clear and definite promise which a promisor could reasonably expect to induce reliance." D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 213 (1987). Dacourt Group Inc. v. Babcock Industries, 767 F. Sup. 157, 161 (D.Conn. 1990). In the present case, no clear and definite promise was made by Marshalls because the lease, by its terms, did not become binding until it was signed and delivered.
A similar claim made by the plaintiffs in R.G. Group, Inc., supra, at 79, resulted in the Second Circuit rejecting it with these words:
 [T]he [p]laintiffs allege that the promise [to grant them a franchise] was made to them in the December 3rd telephone conversation; but, . . ., the entire history of the parties' negotiations made it plain that any promise or agreement at that time was conditional upon the signing of a written contract. Under those circumstances there never was "a clear and unambiguous promise" to plaintiffs that the development franchise was theirs.
 IV.
Plaintiff claims that defendants violated the Connecticut Unfair Trade Practices Act, 42-110 et seq. Section 42-110b(a) provides: No person shall engage in unfair methods of competition and unfair or deceptive CT Page 2452 acts or practices in the conduct of any trade or commerce." A finding of unfairness depends on "`(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businessmen.]'" McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 568 (1984), quoting Conaway v. Prestia, 191 Conn. 484, 492-93 (1983).
To prove a CUTPA violation, a plaintiff can to some degree establish all three of the above criteria, or can establish only one. Prishwalko v. Bob Thomas Ford, Inc.,33 Conn. App. 575, 585 (1994). CUTPA, however, is not "so formless as to provide redress to any person for any ascertainable harm caused by any person in the conduct of any `trade' or `commerce'" Jackson v. R.G. Whipple, Inc., 225 Conn. 705, 725-26 (1993).
The defendants in the instant case acted shabbily. They gave plaintiff the justifiable expectation that a deal had been reached and then after they received the leases signed by plaintiff, they backed out on grounds unrelated to the course of the negotiations and in furtherance of their own self interest. This court has diligently searched for any authority to hold such conduct constitutes a violation of CUTPA and has found none.
Under our law parties are free to make contracts on mutually agreed upon terms, including the requirement that an agreement becomes binding only when signed and delivered, and they are free to terminate the negotiations without obligation right up until the final acts of signing and delivering take place. Corbin on contracts, supra, 2.9, pp. 145-146.
This court concludes plaintiff has not proven defendants violated CUTPA.
V. CT Page 2453
Finally, plaintiff claims defendants violated the implied covenant of good faith and fair dealing. Plaintiff correctly states the law that every "contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Warner v. Konover, 210 Conn. 150, 154, quoting Restatement (Second) of Contracts, 205.
The reference to "performance" and "enforcement" clearly implies the duty of good faith and fair dealing is dependent upon the existence of a binding agreement between the parties. Dacourt Group, Inc. v. Babcock, industries, supra at 160.
There is a duty to negotiate in good faith to consummate a contract in the context of collective bargaining of labor union contracts, General Statutes31-105 (6), Conn. State Labor Rel. Bd. v. Conn. Yankee, Greyhound Racing, Inc., 175 Conn. 625, 631 (1978). Some federal court cases spell out a duty of parties to negotiate in good faith towards reaching a final contract when a binding preliminary commitment has been reached. Teachers insurance and Annuity Association v. Tribune Co., 670 F. Sup. 491 (S.D.N.Y. 1987).
In the present case, even though the parties had mutually agreed on all the substantive terms of the lease, the defendants still had the right to rely upon Article XVIII Section 17 of the lease and to refuse to take the ultimate step of signing the document. This refusal, as deeply disappointing as it is to plaintiff, is not a violation of the implied covenant of good faith and fair dealing.
The plaintiff having failed to sustain all of his claims, judgment may enter, accordingly, for the defendants.
Robert Satter, State Judge Referee CT Page 2454