Houston, J.
Plaintiff First General Realty Corporation (“First General”) brings this action against defendant Joseph Carpinteri (“Carpinteri”), in his capacity as trustee of the D.A.B. Realty Trust, alleging breach of contract, breach of an implied covenant of good faith and fair dealing, and violation of G.L.c. 93A. This action arises from Carpinteri’s refusal to proceed with the sale of an office building that was the subject of an offer to purchase (“OTP”) executed by the parties on February 24, 1997. The case was tried before the court on November 6, 2000 through November 9, 2000. Based upon all the credible evidence, the court makes the following findings of fact and rulings of law.

FINDINGS OF FACT

1. First General is a Massachusetts corporation with its usual place of business at 93 Union Street, Newton Center, Massachusetts. First General is engaged in the business of real estate acquisition and management.
2. Carpinteri is, and at all relevant times has been, the sole trustee and beneficiary of the D.A.B. Realty Trust. The trust owns real estate located at 463 Worcester Road, Framingham, Massachusetts (the “Property”). The Property consists of a large four story office building and surrounding parcel of land.
3. Early in 1997, Carpinteri was contacted by Paul Pescosolido (“Pescosolido”), a real estate broker affiliated with Carlson Real Estate. On February 12, 1997, Carpinteri and Pescosolido entered into a written brokerage agreement whereby Carpinteri agreed to pay a three percent commission in the event Pescosolido provided a buyer for the Property. Exhibit 9.
4. Carpinteri authorized Pescosolido to advertise the Property at a sale price of $3.5 million dollars. Pescosolido then proceeded to create a brochure containing the purchase price, which was ultimately given to Richard V. Wakeman (“Wakeman"), Vice President of Acquisitions for First General.
5. On February 19, 1997, First General submitted a written OTP, drafted and signed by Wakeman, offering to purchase the Property for $3.2 million dollars. Exhibit 29. Carpinteri rejected that offer.
6. On February 24, 1997, Carpinteri, Wakeman, and Pescosolido held a meeting in a further attempt to forge a deal. During the meeting, the parties utilized the prior OTP that was previously rejected by Carpinteri, making handwritten changes to the face of the document. All handwritten changes were initialed by *41 Carpinteri and Wakeman. At the conclusion of the meeting both parties signed the OTP.
7. The OTP is a two-page document entitled “Offer to Purchase Real Estate" and sets forth the following:
A. the location and description of the Property;
B. that the “TOTAL PURCHASE PRICE” was “3,400,000" (the figure ”3,400,000" is handwritten and appears above the typed figure of “$3,200,000,” which was crossed out);
C. that a check for “$34,000.00" was to be placed in escrow by First General ”as a deposit to bind this offer" (similarly, the “$34,000.00" figure is handwritten above the typed figure of ”$32,000," which was crossed out);
D. that the OTP is “(s]ubject to a mutually acceptable Purchase and Sale Agreement, which, when executed on or before March 21, 1997 at 4:00 PM, shall be the Agreement between the-parties hereto;”
E. that the Buyer was to obtain financing of “$2,550,000 at conventional rates and terms” (the figure “$2,550,000" is handwritten over the typed figure of ”2,400,000," which was crossed out);
F. that any additional roof rental income, with the exception of income derived from AT&T, be capped at 10.5% and paid for at closing (this provision is handwritten at the bottom of page one of the OTP);[1]
G. that First General pay the balance at closing;
H. that Carpinteri provide title “that is . . . clear[,] . . . marketable, and insurable at standard rates”;
I. and that First General be allowed a fifteen-day due diligence period, during which First General would have the power to “terminate . . . [the] . . . agreement” if it was not satisfied;
Exhibit 1.
8. The signature line on the last page of the OTP recites that “(t]his offer is hereby accepted upon foregoing terms and conditions.” Both Wakeman and Carpinteri signed below typed language stating “witness my hand and seal.”
9. I find that the parties intended to be contractually bound by the OTP executed on February 24, 1997. The OTP was the end result of a process of negotiation, as reflected by the handwritten changes made to the face of the document. These handwritten changes, viewed in conjunction with the typed language of the OTP, objectively establish the parties’ intent to be contractually bound to the purchase and sale of the Property because all material terms were included in the document. The OTP specifically identifies and describes the Property, contains a specific purchase price, contains a provision relating to financing, sets forth the amount of the escrow deposit necessary to bind the deal, and sets forth a provision defining acceptable title standards. Moreover, the OTP recites familiar contractual language evincing the parties’ intent to be bound, using such terms as “offer,” “acceptance,” and “agreement”; also significant is the fact that both parties signed the OTP under “seal.”
10. In addition, at the February 24, 1997 meeting, the parties discussed seller financing, whereby Carpinteri would accept a promissory note in the amount of $400,000 and a second mortgage as partial payment of the purchase price. No provision as to seller financing, however, was included in the written terms of the OTP.[2]
11. Structuring a transaction with seller financing can be to the advantage of the seller, in that it permits the seller to defer a portion of the tax obligation on the gain, and of the buyer, in that it permits the buyer to purchase the property with less of its own funds.
12. On the same day that the OTP was executed, Wakeman sent a check for $34,000 to the escrow agent and attorney for First General, Lawrence Silverstein (“Silverstein”). Exhibit 7. Wakeman also sent a letter to Carpinteri informing him that a deposit check had been sent to Silverstein to “bind” the parties’ “agreement.” In the letter, Wakeman also requested that due diligence materials be made available. Exhibit 8.
13. The language of the OTP stated that the offer was good until “5:00 PM Eastern Time on the 21st day of February 1997.” The OTP was signed by both parties, however, on February 24, 1997, several days after this deadline had already passed. This oversight is undoubtedly attributable to the fact that the parties used the previously rejected OTP to facilitate their negotiations. Since the rejected OTP was originally dated February 19, 1997, and was intended to expire two days thereafter, I find that it was the parties intent that First General have two days after execution of the OTP to provide the appropriate deposit to bind the OTP.
14. Because the parties intended to be bound by the OTP and because Wakeman submitted the appropriate deposit on the same day as its execution, I find that the parties created an irrevocable firm offer that was accepted on February 24, 1997; thus, a contract was formed. I also find that the deadline for execution of a mutually acceptable purchase and sale agreement (March 21, 1997 at 4:00 p.m.) contained in the OTP operated as a condition subsequent, which, if not met, would extinguish the parties’ obligations.
15. Following the execution of the OTP, Pescosolido stopped marketing the property.
16. Wakeman, with Carpinteri’s cooperation, immediately began his due diligence work. That due diligence included scheduling and verifying the income and expenses related to the Property.
17. I find that Wakeman did not discover any adverse information during the due diligence check. Moreover, I find that First General did not exercise its contractual right to terminate the OTP within the fifteen-day due diligence window set forth in the agree *42 ment, nor did First General seek to terminate the OTP at anytime thereafter.
18. Wakeman also immediately sought to arrange financing for the acquisition, and obtained a written representation from a mortgage broker that several lenders were willing to provide a first mortgage loan. Exhibit 22. Wakeman, however, was unable to obtain financing without a signed purchase and sale agreement (“P&S” agreement).
19. First General retained attorney Silverstein, and Carpinteri retained attorneys Herbert Lemelman and Andrew Lemelman to prepare a mutually acceptable P&S agreement. In March and April 1997, the parties’ attorneys exchanged several draft P&S agreements and negotiated revisions. Exhibits 3, 10, 12-14.1 find that the parties’ attorneys obtained their respective clients’ authorizations for all revisions. A,s to Silverstein’s role in the negotiation, he consulted directly with Wakeman as to First General’s wishes and personally offered revisions in the various P&S drafts. As to Carpinteri’s attorneys, Herbert Lemelman consulted daily with his client and instructed Andrew Lemelman as to Carpinteri’s wishes; thereafter, Andrew Lemelman negotiated revisions in the language of the draft P&S agreements on behalf of Carpinteri.
20. The first draft P&S agreement was prepared by Carpinteri’s attorneys. The parties’ attorneys had not discussed between themselves the provisions of the deal prior to transmittal of the first draft. The first draft provided for a purchase price of $3.4 million with $400,000 of seller financing. It provided that purchase money financing would be subordinate to a first mortgage up to $2.55 million. The purchase price and first mortgage financing amounts were in accordance with the OTP. As stated before, the provision for seller financing was not a part of the OTP, but was discussed at the parties’ February 24, 1997 meeting. The draft P&S agreement also provided that the only basis upon which the price would increase would be if additional leases, other than with AT&T, were obtained relating to the roof, and then at a cap rate of 10.5%. This too was in accordance with the terms of the OTP.
21. The first draft P&S agreement also addressed several terms absent from the OTP and that the parties had not previously discussed. It provided for the opportunity to conduct a “like kind” exchange of real estate pursuant to Section 1031 of the Internal Revenue Code.[3] The agreement also provided that Carpinteri would warrant and represent as to the accuracy of all leases in existence as of the date of the execution of the P&S agreement, and that the leases were to be annexed to the agreement. With respect to the effect of damage to the property by fire or casualty prior to closing, the draft provided that if the value of the damage was in excess of $100,000, either party could terminate the agreement. Otherwise, buyer would receive the proceeds of the insurance that seller had in place. The agreement also provided that if the value of any property taken by eminent domain was greater than $100,000, either party would have the right to terminate the agreement. Otherwise, the buyer would be entitled to whatever award was made for the taking. Exhibit 10.
22. By correspondence dated March 26, 1997, Silverstein received a proposed promissory note and mortgage for the seller financing on the transaction from Andrew Lemelman. The documents provided for a loan of $400,000, secured by a second mortgage on the Property. Exhibit 11.
23. On April 2, 1997, Silverstein communicated proposed modifications to the first draft P&S. Among the modifications, First General requested that the amount of institutional financing be increased from $2.55 million (the amount listed in the OTP) to $2.72 million. Exhibit 12. Carpinteri objected to this increase.
24. By correspondence dated April 7, 1997, Andrew Lemelman transmitted a further draft of the P&S agreement to Silverstein. The draft provided in pertinent part a sale price of $3,400,000 and seller financing in the amount of $400,000. Carpinteri warranted and represented the accuracy of the service agreements and leases, copies of which were to be annexed to the agreement. With respect to loss in case of fire or other casualty, or a taking by eminent domain, the provisions remained substantially the same. This draft also incorporated a change proposed by First General that if legal action was necessary, the non-prevailing party would be responsible for legal fees. Exhibit 13.
25. The April 7, 1997 draft provided for institutional financing in the amount of $2.6 million, a decrease from the amount requested on April 2, 1997, yet still $50,000 more than provided for in the OTP. The April 7, 1997 draft also provided that the first mortgage financing could be increased a proportional amount relating to an increase in the purchase price from capitalization of additional roof income.
26. On April 10, 1997, following comments from Silverstein, Andrew Lemelman once again transmitted a draft P&S agreement. The fax transmittal page specifically provided that Silverstein should “call with any comments or to arrange execution of same.” Exhibit 14.
27. The April 10, 1997 draft P&S agreement, as with the others, provided for a purchase price of $3.4 million and seller financing of $400,000. The institutional first mortgage financing was set at $2.6 million. Again the draft provided that First General would be allowed to increase the institutional financing in proportion to increased income from the roof. Also under the terms of this draft, Carpinteri was to provide an updated environmental report from GZA GeoEnvironmental, Inc. (Carpinteri had previously provided a report to First General from this firm dated February 1, 1996, indicating the Property was clean).
*43 28. By facsimile dated April 11, 1997, Andrew Lemelman transmitted to Silverstein a version of the P&S agreement ready for execution. The cover letter stated “(c)lean copy. I should have the exhibits on Monday.” Exhibit 3. Andrew Lemelman told Silverstein that the provisions of this document were satisfactory to Carpinteri, and that the transaction was ready for execution. The attorneys then made arrangements to execute the document. In all respects, this draft of the P&S agreement was identical to the previous one.
29. I find that all of the negotiated terms in the various draft P&S agreements not contained within the OTP were either ministerial or nonessential terms of the bargain. Thus, the provisions for seller financing,[4] risk of loss, a “like kind” real estate exchange, a financing adjustment for increased roof rental income, and the requirement that the non-prevailing party in a litigation dispute would be responsible for legal fees were either ministerial or nonessential. All of these provisions were negotiated amicably, and none confer any particular advantage on either party at the expense of the other. Indeed, inclusion of these terms was beneficial to the parties. Moreover, I find that First General was willing at all times to forego these terms and perform solely under the terms set forth in the OTP.
30. With respect to the dispute over the amount First General would be able to obtain in institutional financing, I do not find that the parties were negotiating an essential term of the deal, as First General was willing at all times to withdraw its request for increased financing and perform under the amount provided for in the OTP.
31. The OTP provided that the P&S agreement was to be executed on or before March 21, 1997 at 4:00 p.m. To ensure that the commitments and obligations under the OTP did not lapse, Andrew Lemelman repeatedly drafted and obtained from Silverstein agreements to extend the time pursuant to the OTP for execution of the P&S agreement. Such written extensions were transmitted and agreed to on March 21, 1997, extending the time to March 28, 1997; on March 28, 1997, extending the time to April 3, 1997; on April 3, 1997, extending the time to April 7, 1997; onApril 7, 1997 extending the time to April 10, 1997; on April 10, 1997, extending the time to April 14, 1997; and finally, on April 15, 1997, extending the time to April 17, 1997 at 5:00 p.m.
32. I find that the condition subsequent in the OTP, requiring that a mutually acceptable P&S agreement be executed by March 21, 1997, was waived. Andrew Lemelman prepared written extensions that were executed by Silverstein, continued to negotiate revisions to the draft P&S agreements well past March 21, 1997, and never objected to the passing of the deadline.
33. On April 15, 1997, David Zussman (“Zussman”), President of First General, executed the last P&S agreement drafted by the parties and delivered it to Andrew Lemelman. Exhibit 4. I find that First General executed the P&S prior to execution of the last time-extension. In any event, I find nothing to indicate that time was of the essence here, or that First General did not execute the P&S agreement within a reasonable time.
34. Carpinteri refused to execute the P&S agreement.
35. OnApril 15 or 16, 1997, Carpinteri indicated to Zussman that he would not sell the property for $3.4 million, but rather was raising the price by an additional $265,000. No other reason was provided by Carpinteri for refusing to execute the P&S agreement. I infer that Carpinteri refused to sign the P&S agreement solely because he wanted more money for the Property.
36. Silverstein immediately communicated to Andrew Lemelman, both orally and in writing, that Carpinteri’s failure to execute the P&S agreement was a breach of the OTP. Exhibit 15.
37. Carpinteri’s request for additional money was not based upon any provision in the OTP. The OTP was clear that the purchase price was $3.4 million and would only be adjusted by any additional income from the roof received from sources other than AT&T. I find that there never was any additional roof income and therefore the price was $3.4 million.
38. First General was ready, willing, and able to purchase the Property in accordance with the OTP or the final P&S agreement. First General had available over one million dollars in liquid assets, a line of credit for another one-half million dollars, and other substantial resources. Moreover, First General is presently ready, willing, and able to purchase the Property in accordance with the OTP.
39. I find that Carpinteri breached the terms of the OTP on April 15, 1997 by refusing to execute the P&S agreement at a sale price of $3.4 million.
40. I do not find that Carpinteri breached the terms of the P&S agreement itself because Carpinteri never signed it. Thus, enforcement of the P&S agreement is barred by the Statute of Frauds.
41. I do not find credible Carpinteri’s testimony that he believed he was not bound by the OTP. Rather, I find that both parties intended to be bound by the OTP and that Carpinteri knowingly and wilfully violated its terms by refusing to execute the P&S agreement, solely because he wanted more money at the eleventh hour. This finding is supported by the fact that Carpinteri rejected the first OTP form submitted by First General and by the fact that Carpinteri agreed to execute the OTP only after the parties negotiated material terms on February 24, 1997, thereby raising the inference that Carpinteri took execution of the document seriously. Moreover, this finding is also supported by Carpinteri’s conduct subsequent to the execution of the OTP, in that he amicably negotiated ministerial *44 and non-essential terms for inclusion in the P&S agreement for over a month. Also notable is the fact that Pescosolido stopped marketing the Property during this time, bolstering the inference that Carpinteri knew he was bound to the OTP because he was no longer seeking a buyer.

RULINGS OF LAW

I. Enforceability of the OTP
Under Massachusetts law, an accepted OTP real can constitute a binding and enforceable con-agreement. See McCarthy, 429 Mass. at 86. an OTP constitutes a binding contract turns whether the parties intended to be bound. See id. 87. Ordinarily, language contemplating the execuof a final written agreement gives rise to a strong inference that the parties did not agree to all material aspects of a transaction and thus did not intend to be See id. “If however, the parties have agreed all material terms, it may be inferred that the purpose of a final document which the parties agree execute is to serve as a polished memorandum of already binding contract.” Id. (quoting Goren v. Investments Inc., 25 Mass.App.Ct. 137, 140 (1987)). “Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof. McCarthy, 429 Mass. at 87 (quoting Coan v. Holbrook, 327 Mass. 221, (1951)).
Carpinteri, contending that the OTP was not a binding contract to purchase real estate, characterizes the OTP as a non-binding “agreement to agree” and argues that there was no intent to form a binding contract. Carpinteri contends that this intent not to be bound is shown by the parties’ negotiations over allegedly material terms to be included in the P&S agreement. I disagree.
I rule that the OTP executed by the parties on February 24, 1997 was a binding agreement. The OTP was a firm offer, the acceptance of which bound Carpinteri to sell and First General to buy the Property. See McCarthy, 429 Mass. at 88. “The controlling fact is the intention of the parties.” Id. at 87. “If a contract is not ambiguous, the court need not look beyond the four corners of the document to determine the parties’ intent.” In re Sergi, 233 B.R. 586, 589 (1st Cir. BAP 1999) (construing Massachusetts law). See also Foss, 1999 WL 818065 at * 7 (“In seeking to ascertain the intention of the parties, we start with the document itself. If the intention of the parties can be adequately determined from looking at the document itself, we go no further"). Here, the OTP unambiguously indicates that the parties intended to be bound because it shows agreement as to all material terms. Where the parties have agreed to all material terms, the court may infer that the purpose of a final document is to serve as a polished memorandum of an already binding deal. See Goren, 25 Mass.App.Ct. at 140. The OTP identifies and describes the property, contains a specific purchase price, contains a financing provision, sets forth a deposit amount, acceptable title standards, and a date of execution for a P&S agreement.[5] Moreover, the OTP uses the familiar contractual language of “offer,” “acceptance,” and “seal.” See McCarthy, 429 Mass. at 88 (holding that an OTP was binding where the agreement employed “familiar contractual language”). Thus, based on the intent of the parties as shown in the OTP, I rule that the parties are contractually bound to the purchase and sale of the Property.
As stated earlier, I find that the terms negotiated by parties as part of drafting a suitable P&S agree-insofar as they depart from the terms of the OTP, either ministerial or nonessential terms of the bargain. Requests to vary terms after the execution of OTP simply represent discussions by the parties tailor the transaction in a different way. They do not establish that no agreement was reached in the OTP. Costello v. Pet, 17 Mass.App.Ct. 382, 387 (1984) request for a modification accompanying an acceptance does not prevent the formation of a contract where it is clear that the offeree intended to accept!,] whether or not the modification was accepted”). The discussions between the parties in the course of draft-the P&S agreement were in the nature of the parties seeking slightly different terms, rather than demanding conditions of the deal and creating an impasse. See id. (a party may seek to “improve the deal” without “destroying it altogether”) (citations omitted).
the OTP did not terminate because First General did not exercise its right to terminate within the due diligence period, nor did the obligations under the OTP terminate when the March 21, 1997 deadline for execution of the P&S agreement passed, as the parties waived this deadline by executing written extensions and by continuing to negotiate. Words and conduct attributable to Carpinteri waived the deadline. See Church of God in Christ, Inc. v. Congregation Kehillath Jacob, 370 Mass. 828, 832 (1976) (oral extension, acceptance of payments, and continued dealings between the parties signified waiver).
II. Enforceability
OTP, however. First General also seeks enforcement of the P&S agreement as an oral modification of the written OTP. First General contends that enforcement of the P&S agreement is not barred by the Statute of Frauds because the “Cummings” rule applies.
Under the Cummings rule, “amendments to a contract that is within the Statute of Frauds are themselves within the Statute of Frauds.” See Rex Lumber Co. v. Acton Block Co., 29 Mass.App.Ct. 510, 515 (1990) (citing Cummings v. Arnold, 3 Met. 486, 489-92 *45 (1842); Whittier v. Dana, 10 Allen 326 (1865); Rosenfeld v. Standard Bottling & Extracts Co., 232 Mass. 239, 245 (1919)). This rule, however, is narrow. Under the Cummings rule, “a party may rely on the orally agreed-to amendments only as a defense to a claim for breach of the terms of the unamended contract.” See Rex Lumber, 29 Mass.App.Ct. at 515. In addition, under an exception to the Cummings rule, a plaintiff may use the rule offensively to “enforce a contract that falls within the Statute of Frauds which has been modified by an oral agreement to extend the time for performance; even though the plaintiff must rely on that extension to show his compliance with the contract terms.” See id. (citing Stearns v. Hall, 9 Cush. 31 (1851). Presumably, First General relies on this exception to support its claim that the P&S agreement is enforceable.
In this case, the Cummings rule is inapplicable. This dispute does not involve an oral agreement to extend the time for performance, nor does the plaintiff need to rely on such an extension to show its compliance with the contract terms. Hence, the P&S agreement is unenforceable because it violates the Statute of Frauds. First General, as the party seeking to enforce the P&S agreement, failed to meet its burden of proof by not only proving an agreement, but also a memorandum in writing signed by Carpinteri containing the terms of that agreement insofar as First General seeks to enforce them. See Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 710 (1992); G.L.c. 259, §1 (1992). Thus, the P&S agreement is of no effect and its terms cannot be considered oral modifications of the OTP.
III. Covenant of Good Faith and Fair Dealing
“Every contract implies good faith and fair dealing between the parties to it.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991) (quoting Kerrigan v. Boston, 361 Mass. 24, 33 (1972)). The covenant provides “that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.” Anthony’s, 411 Mass. at 471-72 (quoting Druker v. Roland Win. Jutras Assocs., 370 Mass. 383, 385 (1976).
I rule that Carpinteri violated the covenant of good faith and fair dealing implied in the OTP. Because I find that Carpinteri breached the terms of the OTP solely because he wanted more money, it follows that he breached the implied covenant of good faith and fair dealing because he injured First General’s right “to receive the fruits of the contract.” Anthony’s, 411 Mass. at 471-72.
IV. Chapter 93A
Similarly, I rule that Carpinteri violated G.L.c. 93A. General Laws c. 93A, §2(a) (1997) makes unlawful any “(u)nfair . . . act or practices in the conduct of any trade of commerce.” “This prohibition is ‘extended to those engaged in trade or commerce in business transactions with others similarly engaged’ by G.L.c. 93A, §11.” Anthony's, 411 Mass. at 474 (quoting Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 779 (1986)). Conduct “ ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.”Anthony’s, 411 Mass. at 474 (quoting Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986)). Because I find that Carpinteri’s breach of the OTP was a knowing and wilful attempt to obtain additional benefits, i.e. more money, I rule that Carpinteri violated c. 93A.
Moreover, I rule that First General is entitled to recover its reasonable attorneys fees. Chapter 93A, § 11 permits an award of attorneys fees where there has been an unfair or deceptive trade act. Although under Section 11 an aggrieved party is entitled to multiple (double or triple) damages for knowing or wilful violations, awards of attorneys fees are not subject to doubling or trebling. See Rex Lumber, 29 Mass.App.Ct. at 522. Here, First General seeks specific performance and has not shown monetary damages. Therefore, under c. 93A, the only remedy the court can and will impose for violating the statute is an award of reasonable attorneys fees and costs to First General.
V. Specific Performance
Finally, I rule that First General is entitled to specific performance of the OTP. “A judge generally has considerable discretion with respect to granting specific performance, but it is usually granted in disputes involving the conveyance of land.” McCarthy, 429 Mass. at 89 (citing Raynor v. Russell, 353 Mass. 366, 367 (1967)). “It is well-settled law in this Commonwealth that real property is unique and that money damages will often be inadequate to redress a deprivation of an interest in land.” Greenfield Country Estates Tenants Ass'n, Inc. v. Deep, 423 Mass. 81, 88 (1996). “Specific performance of real estate contracts is appropriate ‘in the absence of significant equitable reasons for refusing such relief.’ ” Costello, 17 Mass.App.Ct. at 387 (quoting Raynor, 353 Mass. at 367-68). Accordingly, because this dispute involves a deprivation of an interest in land, and because there are no equitable reasons for refusing such relief, I rule that the OTP must be specifically performed.
ORDER FOR JUDGMENT
It is hereby ORDERED that judgment be ENTERED for plaintiff on Count I of its Amended Complaint. Furthermore, it is ORDERED that thirty (30) days from the date of this judgment, or at a date mutually agreed upon by both parties, pursuant to the terms of the OTP, defendant shall convey marketable title to the property located at 463 Worcester Road, Framingham, Massachusetts, to plaintiff in exchange for the purchase price of $3.4 million dollars.
*46 As to Count II of plaintiffs complaint, alleging violation of c. 93A, it is the determination of this court that the plaintiff is entitled to recover its reasonable attorneys fees and costs as damages. As the amount of plaintiffs reasonable attorneys fees cannot be determined on the record before the court, the parties are ORDERED to contact the clerk and arrange a hearing on the matter.

 The parties included this formula for increasing the purchase price in the event that Carpinteril was successful in leasing roof space for the use of cellular transmitters, thereby raising the value of the Property (Carpinteri had already negotiated a lease agreement with AT&T and believed that he could lease additional space prior to the sale).

 Parol evidence is examined to ascertain whether the parties intended to be contractually bound, not to determine the terms of the parties' bargain.

 A “like kind” provision is for the seller’s benefit in that it allows him to defer tax liability from the sale of real estate by buying another piece of real estate. TR I pg. 20.

 Because the parties discussed seller financing at the February 24, 1997 meeting, the same meeting where the parties negotiated the terms of the OTP, I find that seller financing was not an essential term of the parties bargain, otherwise they would have written such a provision into the OTP.

 Although the OTP does not contain a closing date, such an omission is not fatal to First General’s claim, as the court may imply a reasonable time. See A.B.C. Auto Parts, Inc. v. Moran, 359 Mass. 327, 329 (1971).