van Gestel, J.
This matter is before the Court, pursuant to Mass.R.Civ.P. Rule 56, on the motion of the defendant, David K. Landrith (“Landrith”) (Paper #29), for summary judgment on the complaint of the plaintiff, One to One Interactive, LLC (“OTO”), and on Counts I, II, V, VT, VIII and X, and for liability on Count IX, of the third amended counterclaim.
BACKGROUND
The uncontested facts reveal the following.
In 1997, OTO was co-founded by Landrith and certain of the counterclaim defendants,[1] Ian Kamell, Jeremi Kamell and Michael Donnelly.
OTO did not execute its first LLC Operating Agreement until September 1, 2000.
In the fall of 2000, SSB Investments, Inc. (“SSB”), a subsidiary of State Street Bank Corporation and OTO’s largest account, offered to invest $1 million in OTO in return for a 6% ownership interest. In order for the SSB investment to occur, OTO needed to amend its Limited Liability Company Agreement (“Operating Agreement”) to allow for the issuance of Preferred Class A membership to SSB. This amendment required the signatures of all of OTO’s Class A members, including Landrith.
In connection with the SSB investment, OTO’s Class A members issued a “Manager’s Resolution Effective September 28, 2000" (“Manager’s Resolution”). The Manager’s Resolution stated, among other things, that OTO ”is valued at $16,700,000" and that such valuation is “an appropriate and equitable value for the firm.” The $16,700,000 figure was not the product of an appraisal but was “arrived at based on *86 the purchase price (of $1,000,000) offered by SSB for 6% of the equity . . .”[2]
The Manager’s Resolution also reflected the proportional dilution of each member’s Class A ownership interest to be caused by the SSB investment. Landrith’s interest, diluted from 21% of the company to 18% of the company, was $3,518,017.38.
Also in the fall of 2000, the other members of OTO decided to reduce Landrith’s position with the company. Landrith was offered two alternatives: first, he could continue working as an employee with a small ownership stake in OTO; or second, he could surrender his employment and sell his membership units back to OTO. Landrith chose the latter.
At this time Landrith was aware that OTO had an Operating Agreement that, in Section 8.1, directed the manner of redemption of shares. On advice of his brother, a lawyer, Landrith advised OTO that he “wanted to negotiate better terms” and “did not feel comfortable proceeding with the State Street agreement until [he] had negotiated those terms and put them in writing, along with the purchase price.”
Donnelly, an OTO member and himself an attorney, served as intermediary in negotiations between Landrith and the other Class A members. The negotiations between Landrith and Donnelly took place in 2 or 3 meetings over the course of 7 to 10 days late in November 2000. The items discussed included when Landrith would leave the firm, under what conditions, meaning what would the employees be told, and drafting the agreement.
At the time of the negotiations, the closing of the SSB $1 million investment was fast approaching. Landrith advised Donnelly that he would not sign an Amended Operating Agreement authorizing the issuance of Class A shares to SSB unless he first received the terms of his redemption in writing. For that reason OTO gave Landrith a signed and detailed term sheet, in return for Landrith’s signature on the execution page of the Amended Operating Agreement. Landrith signed the term sheet on November 28, 2000, and he signed the Amended Operating Agreement on the following day.
The term sheet was drafted by Donnelly and sent to Landrith on November 27, 2000. The cover letter in the facsimile transmission reads as follows:
Donnelly, Michael
From: Donnelly, Michael
Sent: Monday, November 27, 2000 6:41 PM
To: Landrith, David
Subject: Memo for: One to One Managers
Dave,
These are the terms we discussed. Tomorrow I will put this into the form of a term sheet for signature and we can send it out to our attorneys for the creation of the appropriate documents to execute the transition. Let me know if you have any questions.
Thanks,
Mike
Because of its significance to this case, the Court here quotes in its entirety the term sheet, including its title.
One to One Interactive Proposed Terms
Pursuant to Section 8.1 of the One to One Interactive Operating agreement that governs the repurchase of Class A units, the following terms are provided with respect to the proposed repurchase of Class A Units from you:
1. That the value of the shares is established per the capitalization schedules as executed at the closing of the State Street Investment, approximately $3,510,968.
2. That the annual interest rate applied to this amount or any amount outstanding be set at Prime as defined by the prime interest rate for January 1 in advance of the year in question.
3. That One to One Interactive agrees to a repayment period of five (5) years, provided that there is the potential for an extension in the event of exigencies, such exigencies to be negotiated by the parties, but that in the event of any extension, the interest rate would increase by one full percentage point for the following year on any outstanding balance for which an interest payment would be due.
4. That One to One Interactive agrees to a payment schedule that is linked to the financial performance of One to One Interactive for each year ending as follows:
a. When revenue equals or exceeds tweniy million dollars ($20,000,000) but is less than or equal to twenty five million ($25,000,000) that a principle [sic] payment of $250,000 in addition to the then due interest payment will be made.
b. When revenue equals of exceeds twenty five million dollars ($25,000,000) but is less than or equal to thirty five million dollars ($35,000,000) that a principle [sic] payment of $750,000 in addition to the then due interest payment will be made.
c. When revenue equals of exceeds thirty five million dollars ($35,000,000) but is less than or equal to forty five million dollars ($45,000,000) that a principle [sic] payment of $1,000,000 in addition to the then due interest payment will be made.
d. When revenue equals or exceeds forty five million ($45,000,000) that a principle [sic] payment of $1,500,000 in addition to the then due interest payment will be made.
5. That One to One Interactive agrees to consider that as it is able to without jeopardizing the financial stability of the firm but within the boundaries *87 of reasonableness, to seek external debt funding to retire DKL’s liability as quickly as is practically possible.
6. That One to One Interactive agrees to pay off the note in cash or in kind upon the occurrence of a liquidity event defined as the purchase by an external entity such that the Class A Unit holders, not including the Series A preferred unit holders, hold less than 50% of the Firm Class A or Class A convertible equity.
7. Other
a. One to One interactive agrees to provide positive references for DKL[3]
b. DKL will abide by cooperate with and support One to One Interactive decision regarding how to manage the announcement of DKL’s departure
c. DKL agrees to sign a release and covenant not to compete/confidentiality and non-solicitation agreement with One to One Interactive.
d. DKL agrees to support and cooperate with an orderly and deliberate transition with a replacement technology leader.
e. One to One Interactive Agrees to indemnify DKL following completion of the transaction.
f. The class A unit holders agree to explore the position of personally guaranteeing the note to DKL
g. One to One Interactive agrees to discuss the possibility of making monthly interest payments in lieu of an annual interest payment.
h. One to One Interactive agrees that DKL may give 4 weeks notice at any point after January 1.
Signed this 28th of November 2000 on Behalf of One to One Interactive,
/s/ Michael P. Donnelly
Michael P. Donnelly, Esq.
Counsel
Acknowledged on this 28th of November 2000,
/s/ David King Landrith
David King Landrith
Section 8.1 of the OTO Operating Agreement in effect on November 28, 2000, reads in relevant part as follows:
Upon the occurrence of any Redemption Event for a Class A Member (as defined below), the Company shall redeem such Member’s Units in the Company. When the Company exercises redemption pursuant to this Section 8.1, the Company shall obtain, as soon as practicable after the occurrence of the Redemption Event, a valuation of the Units of the member in question by an independent third party appraiser. Said appraisal shall use an enterprise methodology for personal service companies on a minority basis (and not a net asset value method), measured on the date of the occurrence of the Redemption Event, in determining the value of the Units of the Member in question.
The SSB $1,000,000 investment in OTO closed on November 29, 2000.
Landrith resigned his employment with OTO effective in January 2001.
In January 2001, a draft of a more formal redemption agreement between OTO and Landrith and a promissory note running in Landrith’s favor was prepared by OTO’s outside counsel and circulated among the Class A members. This draft, in all essential parts, was wholly consistent with and included the points included in the term sheet quoted above. These documents, however, were never executed.
Beginning in January 2001 and continuing for 14 consecutive months thereafter, OTO made monthly payments to Landrith in the amount of $13,897.58, a number which was exact to the penny with the amounts recited in the November 28,2000 term sheet.
On March 8, 2001, OTO wrote to Landrith a letter that contained the following:
Since our decision to terminate your management agreement in late 2000 and coincident with our decision to redeem your investment in One to One Interactive the market has changed dramatically. Even as Mike was discussing the proposed terms of the buy-back with you, many firms in our space were laying off thousands of employees with their market values plummeting drastically.
We believe that the previously discussed value does not accurately reflect the true market value of the firm. Therefore, we propose that an objective third party appraiser be retained to assess the true market value of the firm’s capital structure. This is discussed in the operating agreement in Article 8; a copy of the entire agreement is enclosed herewith. We propose that One to One pay for the appraisal. We will put the fee in escrow and have our mutual representatives jointly select the appraiser to preserve impartiality.
During this period we will continue to remit the monthly amounts to you in anticipation of settlement. These amounts would be credited to the final settlement figure.
We remain in agreement about the payment terms and depending on the appraiser’s findings, may be in a position to accelerate the payment of the final amount.
Throughout 2001 and early 2002, OTO and Landrith negotiated, unsuccessfully, in an attempt to reach a settlement. Also during this period, OTO on its own engaged an appraiser who concluded that Landrith’s interest should be valued at $650,770. Landrith never accepted this position. Then, in March of 2002, OTO ceased making its monthly payments and its semiannual interest payments.
*88 In late February 2002, OTO sent to Landrith an IRS Form K-l for tax year 2001. This form attributed to Landrith $174,638 in payments taxable as ordinaiy income. OTO did not distribute any cash to Landrith to cover his K-l tax liability, despite provisions in the Operating Agreement requiring such a distribution. Both the attribution of income and the failure to make a tax distribution appear to be in error.
Next, OTO offered to purchase Landrith’s units for approximately $650,770, over time and minus the interest payments previously made.
Landrith responded to this offer with a G.L.c. 93A demand, which OTO rejected. In its response, OTO stated that, “[a]s the Company has chosen not to exercise its option under the Amended and Restated LLC Agreement to redeem Mr. Landrith’s interest in the LLC, the Company’s Accounting Firm will amend Section J. of Mr. Landrith’s K-1 to reflect this position.”
This litigation began on September 18, 2002, with OTO’s complaint for declaratory judgment, which was responded to by Landrith’s answer and first counterclaim on October 18, 2002.
DISCUSSION
Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Opara v. Massachusetts Life Insurance Company, 441 Mass. 539, 544 (2004); Lindsay v. Romano, 427 Mass. 771, 773 (1998); Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 283 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The motion’s resolution here depends to a great degree upon a proper interpretation of the November 28, 2000 term sheet. These are questions of law for the Court. Lumber Mut. Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). “In the absence of an ambiguity, [the Court] will ‘construe the words of the [document] in their usual and ordinaiy sense.’ ”116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Company, 433 Mass. 373, 376 (2001). The mere fact that parties disagree on the proper construction of a document’s language does not necessarily establish an ambiguity. Lumbermans Mut. Cas. Comp. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
The document is, however, to be read in light of the circumstances of its execution, which may enable a Court to see whether its words can be understood or are actually ambiguous. Robert Industries, Inc. v. Spence, 362 Mass. 751, 753 (1973).
When an element of ambiguity does appear in a document, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the [Court] is to construe the [document] as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the November 28, 2000 term sheet as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous document, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written document. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
The basic law applicable to interpreting the November 28, 2000 term sheet is stated principally in four cases: Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875 (2002); McCarthy v. Tobin, 429 Mass. 84 (1999); Lafayette Place Associates v. Boston Redevelopment Authority, 427 Mass. 509 (1998); and Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703 (1992).
Situation Management, the most recent of the cases, includes in 430 Mass, at p. 878, the following general comment:
It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement [citing McCarthy] ... It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract [citing Lafayette] . . . The parties must, however, have progressed beyond the stage of “imperfect negotiation.”
The part of McCarthy cited in Situation Management appears in 429 Mass, at p. 87. It reads:
The controlling fact is the intention of the parties. See Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992), quoting Kuzmeskus v. Pickup Motor Co., 330 Mass. 490, 493 (1953) (“It is a settled principle of contract law that ‘[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract,’ ” Levenson v. L.M.I. Realty Corp., 31 Mass.App.Ct. 127, 130 (1991)).
Both Situation Management and McCarthy cite to Lafayette Place. Situation Management cites to Lafayette Place in 427 Mass, at pp. 517-17 & n.9; and *89 McCarthy cites to Lafayette Place in 427 Mass, at pp. 518. What is being cited, starting at p. 517, reads as follows:
We adhere to the principle that “(a]n agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto,” . . . in the circumstances that justify and give rise to it: where parties have merely reached the stage of “imperfect negotiation” prior to formalizing a contract, and have not yet reduced their agreement to terms . . . When parties have progressed beyond that stage, however, a competing principle applies: a contract should be interpreted “so as to make it a valid and enforceable undertaking rather than one of no force and effect.” Rules of contract must not preclude parties from binding themselves in the face of uncertainty. If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding.
Footnote 9 in Lafayette reads:
As Judge Leval has said, “Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation. It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties.”
The fourth case, that gets cited in at least two of the three noted above, is Schwanbeck. A segment of Schwanbeck that is relevant appears in 412 Mass, at pp. 706-07, as follows:
It is a settled principle of contract law that “[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract.” Kuzmeskus v. Pickup Motor Co., 330 Mass. 490, 493 (1953). Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501, 506 (1942). Wellington v. Apthorp, 145 Mass. 69, 74 (1887). It is also elementaiy that an unambiguous agreement must be enforced according to its terms. Freelander v. G.&K. Realty Corp., 357 Mass. 512, 516 (1970). There is no ambiguity in the letter of intent between the [parties here). The parties clearly stated certain contractual commitments to which they were binding themselves and, just as clearly, they followed those commitments with an expression of their intention to proceed to negotiate in good faith. That this expression of intent follows the parties’ disclaimer of binding effect and begins with the word “however” does not elevate its status from a mere expression of intent into a binding obligation.
It is with this general legal background that the Court assays the November 28, 2000 term sheet.
When initially delivered to Landrith, the term sheet was just a proposal. It was, as it says in its introductory sentence, “terms . . . provided with respect to the proposed repurchase of Class A Units from” Landrith. However, it was negotiated with the backdropclearly understood by OTO and Landriththat Landrith “wanted to negotiate better terms” than those provided in Section 8.1 of the OTO Operating Agreement and “did not feel comfortable proceeding with the State Street agreement until [he] had negotiated those terms and put them in writing, along with the purchase price.” Thus, when Landrith signed the term sheet on November 28,2000, and followed that signing with the signing of the Amended Operating Agreement on the following day, thereby facilitating the SSB closing, the November 28, 2000 term sheet blossomed into a binding contract.
In the term sheet, the parties clearly stated all the material contractual commitments to which they were binding themselves and, just as clearly, they eachfor a time at least followed those commitments. Landrith signed off on the Amended Operating Agreement and resigned his employment position at OTO. Thus OTO achieved the two things that it wanted: Landrith’s resignation and Landrith’s cooperation in facilitating the SSB infusion of $1,000,000 in OTO. Similarly, Landrith seemed to have achieved what he wanted from OTO: an agreement for the redemption of his units at a value of approximately $3,510,968, which was better than what might be produced under the provisions in Section 8.1 of the Operating Agreement. Indeed, OTO,- essentially immediately, affirmed its agreement, when in January 2001, it began paying Landrith the monthly amount dueright down to the last 58 centsand began the process of having its outside counsel draft the redemption agreement and promissory note.
What OTO did with its March 8, 2001 letter was begin a process at attempting to get out from under the contract it made with Landrith, which process ended with the breach by OTO in the spring of 2002 when it stopped all payments.
Any stage of “imperfect negotiation” ended when OTO and Landrith reduced their agreement to terms on November 28, 2000. As stated above in Lafayette Place, supra, 427 Mass, at 517, when parties have progressed beyond that stage “a competing principle applies: a contract should be interpreted ‘so as to make it a valid and enforceable undertaking rather than one of no force and effect.’ Rules of contract must not preclude parties from binding themselves in the face of uncertainty.”
*90 In Goren v. Royalty Investments, Incorporated, 25 Mass.App.Ct. 137 (1987), Justice Kass captured the situation quite well. After noting that “(i]f . . . the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract,” id. at 140, he went on to say
That is not to say that parties to a preliminary agreement may not provide that they do not intend to be bound until the transaction is buttoned up by a more detailed and formal agreement. There is commercial utility to allowing persons to hug before they marry . . . If “[p]arties to what would otherwise be a bargain and a contract... agree that their legal relations are not affected!,] [i]n the absence of any invalidating cause, such a term is respected by the law like any other term . . .” Restatement (Second) of Contracts sec. 21 comment b (1979). A proviso of that sort should speak plainly, e.g., “The purpose of this document is to memorialize certain business points. The parties mutually acknowledge that their agreement is qualified and that they, therefore, contemplate the drafting and execution of a more detailed agreement. They intend to be bound only by the execution of such an agreement and not by this preliminary document.”
(Emphasis added). Id. at 142-43.
The November 28, 2000 term sheet contains no plain speaking proviso of the sort contemplated by Justice Kass.
Further, the actions of the parties after executing the term sheet clearly exhibit full performanceat least until the negotiations for a modification broke down in the spring of 2002under the term sheet. “Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.” Restatement (Second) of Contracts, Sec. 34(b). See, e.g., Cataldo v. Zuckerman, 20 Mass.App.Ct. 731, 737-38 (1985). The term sheet is a binding contract.
Having found the November 28, 2001 term sheet to be a contract binding on both Landrith and OTO, the Court must now examine each of the several counts to determine the effect of that ruling thereon.
OTO’s complaint is in a single count seeking a declaratory judgment “that [OTO] has properly asserted its rights to redemption, that the price established by the appraiser is the value of the units for the purposes of redemption, and that redemption should proceed consistent with the applicable conditions of the Agreement.” The “Agreement” referred to in the complaint is the Amended and Restated Limited Liability Company Agreement that was executed after the November 28, 2000 term sheet.
Whenever a declaratory judgment is sought, the Court, regardless of which way the case comes out, must declare the rights of the parties in a manner consistent with its resolution of the matter at hand. Boston v. MBTA, 373 Mass. 819, 829 (1977); Silverlieb v. Hebshie, 33 Mass.App.Ct. 911, 913 (1992). The Court will do so here.
Turning next to the third amended counterclaim the Court will address the various counts referred to in Landrith’s motion.
Count I charges OTO with a breach of contract and Count II seeks similar relief for breach of the implied covenant of good faith and fair dealing. Summary judgment is warranted in Landrith’s favor on each of these counts. The November 28, 2000 term sheet is the contract and OTO breached it when it stopped making payments thereunder to Landrith. Further, that stoppage of payments, without excuse, deprived Landrith of receiving the fruits of the contract. This is a breach of the implied covenant of good faith and fair dealing. See, e.g., Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72 (1991).
Count V and Count VI charge OTO and others with tortious conspiracy and conspiracy involving coercion. Count VIII charges OTO and others with fraud. Count IX charges OTO and others with violation of G.L.c. 93A, Sec. 2 and 11. Count X alleges that OTO is estopped from refusing to redeem Landrith’s membership units in accordance with the term sheet. Each of these five counts is too fact intensive to be resolved by summary judgment.
ORDER
For the foregoing reasons, David K. Landrith’s Motion for Partial Summary Judgment (Paper #29), is ALLOWED as to the plaintiffs complaint and as to Counts I and II of the third amended counterclaim, and DENIED as to Counts V, VI, VIII, IX and X of the third amended counterclaim.
On the plaintiffs complaint a declaration shall enter to the effect that the November 28, 2000 term sheet is a contract binding on the parties with regard to the redemption and repurchase by One to One Interactive, LLC of all Class A Units of David K. Landrith and it has not been superseded by the Amended and Restated Limited Liability Company Agreement that was executed after the November 28, 2000 term sheet. Thus, the redemption should proceed consistent with the applicable conditions of the November 28, 2000 term sheet.

Michael Donnelly, Stephen Humphrey, Ian Karnell, Jeremi Karnell, Robert Stoloff and McGaldrey & Pullen, LLP.

SSB’s investment is $1 million; 6% of $16,700,000 is just slightly higher at $1,002,000.

The punctuation and capitalization of words, and the lack thereof, are exactly as appears in the document.